RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0372p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

——————————

RANDALL SCOTT WALDMAN; RW LIMITED,
CO.; STONE MACHINE AND FABRICATION,
LLC; INTEGRITY MANUFACTURING, LLC,
            *Defendants-Appellants*,

            v.

RONALD B. STONE,
            *Plaintiff-Appellee*.

> No. 10-6497

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 10-00164—John G. Heyburn II, District Judge.

Argued: January 10, 2012

Decided and Filed:  October 26, 2012

Before:  KETHLEDGE and STRANCH, Circuit Judges; GWIN, District Judge.[*]

——————————

## COUNSEL

**ARGUED:** Michael R. Wilson, WILSON AND WILSON, ATTORNEYS AT LAW, PLLC, Louisville, Kentucky, for Appellants.  Dennis D. Murrell, MIDDLETON REUTLINGER, Louisville, Kentucky, for Appellee.  Jeffrey A. Clair, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Michael R. Wilson, John R. Wilson, WILSON AND WILSON, ATTORNEYS AT LAW, PLLC, Louisville, Kentucky, for Appellants.  Dennis D. Murrell, John M. Matter, Loren T. Prizant, MIDDLETON REUTLINGER, Louisville, Kentucky, for Appellee.  Jeffrey A. Clair, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.

---

[*]The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

———————————

**OPINION**

———————————

KETHLEDGE, Circuit Judge.  Ron Stone, a Chapter 11 debtor-in-possession, brought this adversarial proceeding in bankruptcy court against his principal creditor, Randall Waldman.  After a trial, the bankruptcy court found that Waldman had obtained nearly all of Stone's business assets by means of fraud.  As relief, the court discharged the debts that Stone owed to Waldman, and awarded Stone more than $3 million in compensatory and punitive damages.  Waldman now challenges the bankruptcy court's judgment on several grounds, including that the court lacked constitutional authority to enter it.  Although we affirm the bankruptcy court's discharge of Stone's debts, we hold that the court lacked authority to award him damages.  We therefore affirm in part, vacate in part, and remand.

I.

Stone was the founder and owner of Stone Tool and Machine, Inc. ("STM"), a Kentucky corporation.  Although STM had positive equity, it had limited cash flow.  By 2003, STM owed Fifth Third Bank more than $1 million, secured by mortgages and liens on STM's business assets and on Stone's house.  Eventually, Stone could not keep up with the payments to Fifth Third.

Stone's attorney,  Bruce Atherton, introduced Stone to Waldman as a potential investor in STM.  What Stone did not know was that Atherton was himself indebted to Waldman for tens of thousands of dollars that Atherton had no means to repay.  Atherton planned to settle up with Waldman by helping him to exploit Stone.  Without Stone's knowledge, Atherton gave STM's proprietary business data to Waldman to review.

In August 2004, Atherton filed on behalf of STM a Chapter 11 bankruptcy petition that he said would buy time for STM to acquire new capital from Waldman.  In fact, however, Atherton was advancing only Waldman's interests, seeking to preserve

as many of STM's assets as possible so that Waldman could later acquire them for himself. Atherton barely prosecuted STM's bankruptcy case and allowed the bankruptcy court's automatic stay to expire on November 3, 2004. Fifth Third, STM's principal creditor, then foreclosed on STM's assets in state court. By early 2005, Fifth Third held judgments against both STM and Stone, a related judgment lien on Stone's house, and a mortgage on the house.

Waldman approached Fifth Third before it took possession of any assets. He offered the bank a deal: he would pay $900,000 to Fifth Third in exchange for the bank's rights as a creditor of Stone and STM. Thus, under this scheme, Waldman rather than Fifth Third would become Stone's principal creditor.

Waldman did not have the $900,000 that he needed to buy Stone's debts, so he sought financing from the Bullitt County Bank. As collateral, Waldman offered STM's assets. The problem was that he did not own them yet. So Waldman and Atherton went back to Stone and offered him a deal: Stone would transfer STM's assets to two companies that Waldman owned; in exchange, Waldman would pay off Stone's debts to Fifth Third, the IRS, and other creditors. Waldman also promised Stone a 40% ownership interest in a new business that Waldman would operate with STM's assets, and a job for at least five years. Stone agreed to the deal.

Soon thereafter, Atherton called Stone and demanded that Stone come to his office right away. When Stone arrived, Atherton and Waldman told Stone to sign the deal's closing documents immediately, without reading them, supposedly to meet a filing deadline. Atherton and Waldman assured Stone that the documents reflected the terms of their deal. Waldman also reiterated his promise to pay off Stone's debts. Stone signed the documents. Atherton said that Stone would receive his own copies later.

In fact, however, the documents reflected a different deal: they transferred all of STM's assets to Waldman in exchange for nothing more than a job for Stone with the new company. The documents made no mention of Stone's 40% interest in the new company or of any obligation on Waldman's part to pay off Stone's debts.

While Stone signed his company away, representatives from Fifth Third sat in the room across the hall. Waldman, with the deed to STM's assets in hand and his loan from Bullitt Bank secured, then completed his deal with Fifth Third. (Neither Bullitt nor Fifth Third was aware that Waldman and Atherton had defrauded Stone.) By the time these transactions were complete, Waldman and his companies owned all of STM's assets. Waldman also owned all of Stone's prior indebtedness to Fifth Third, with no obligation to forgive it.

After the deal closed, Waldman and Stone worked together at the new business—called Stone Machine and Fabrication—for more than a year. During that time, Stone repeatedly tried to obtain copies of the May 20, 2005 closing documents. Atherton refused to provide them and eventually he stopped returning Stone's calls. In October 2006, however, Atherton's assistant finally gave Stone the documents. Stone then figured out that he had been swindled. He confronted Waldman, and a fist-fight broke out. With no equity in his business and all of his debts still in place, including the mortgage on his home, Stone resigned from the company.

Waldman and his companies then filed garnishment actions against Stone in an effort to collect on the Fifth Third judgment. Stone responded by filing his Chapter 11 bankruptcy petition. He identified the Waldman debts in his petition as "Disputed." Stone then filed an adversarial proceeding in bankruptcy court, alleging that Waldman had acquired Stone's debts and assets by fraud. Stone also sued Atherton, who is not a party to this appeal but who was disbarred for his involvement in the fraud upon Stone.

Stone's complaint against Waldman sought two types of relief. First, Stone asked the bankruptcy court to discharge his debts to Waldman, all of which Waldman had acquired from Fifth Third (the "disallowance claims"). Specifically, Stone asked the court to discharge a judgment against him, a judgment lien on his property, and a mortgage on his residence. Second, Stone sought affirmative relief to enforce Waldman's promises (the "affirmative claims"). Stone asked for damages (or specific performance) that would satisfy a judgment against him held by MBNA Bank, satisfy

a federal tax lien, and compensate him for a forty percent share of the Waldman-controlled entity that now owned STM's assets.

Waldman appeared in bankruptcy court and counterclaimed against Stone.  He sought a judgment on the Fifth Third debts and relief from the bankruptcy court's automatic stay in order to enforce the liens and mortgages on Stone's residence.

The bankruptcy court held a bench trial in October 2009.  At its conclusion, the court found that Waldman and Atherton had perpetrated upon Stone one of the most egregious frauds the court had ever encountered.  Consequently, the court invalidated all of Stone's obligations to Waldman on the disallowance claims.  It also awarded Stone $1,191,374 in compensatory damages and $2,000,000 in punitive damages on the affirmative claims.  The district court affirmed the bankruptcy court's judgment in all respects.

This appeal followed.

## II.

Waldman challenges on three grounds the bankruptcy court's power to enter its judgment in this case.  First, Waldman argues that Stone's state-law fraud claims are beyond the jurisdiction of any federal court.  Second, Waldman argues that the judgment here was beyond the statutory authority of the bankruptcy court in particular.  And third, Waldman argues that the judgment was beyond the bankruptcy court's power as limited by Article III of the Constitution.  We consider these arguments in turn.

## A.

Waldman argues that Stone's claims lie outside the jurisdiction of any federal court.  To that end, he first contends that Stone's claims do not "arise under" federal law, and thus are beyond the judicial power that the Constitution confers on the federal courts in Article III, § 2.  But Waldman overlooks that a debtor's state-law claim, even for affirmative relief, "may be adjudicated in federal court on the basis of its relationship to the petition for reorganization." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,

458 U.S. 50, 72 n.26 (1982) (plurality opinion). Stone's claims were adjudicated on precisely that basis here, so Waldman's first objection is meritless.

Waldman also contends that Stone's claims are beyond the federal courts' statutory jurisdiction. Title 28 U.S.C. § 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Thus, so long as Stone's claims are at least "related to" his bankruptcy petition—which is itself a case under title 11—the federal courts have jurisdiction over Stone's claims. *See Mich. Emp't Sec. Comm'n v. Wolverine Radio Co.* (*In re Wolverine Radio Co.*), 930 F.2d 1132, 1141 (6th Cir. 1991). A claim is "related to" a bankruptcy case if the "outcome of that [claim] could conceivably have any effect on the estate being administered in bankruptcy." *Lindsey v. O'Brien, Tanski, Tanzer and Young Health Care Providers of Conn.* (*In re Dow Corning Corp.*), 86 F.3d 482, 489 (6th Cir. 1996) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)). Each of Stone's claims will have an effect on his estate here. His disallowance claims challenge the validity of debts that Waldman has sought to enforce in bankruptcy. And a damages award on Stone's affirmative claims would provide assets for his other creditors. *See Celotex Corp. v. Edwards*, 514 U.S. 300, 307 n.5 (1995) ("related to" jurisdiction includes causes of action owned by the debtor that become property of the estate). Thus, the federal courts have jurisdiction over all of Stone's claims notwithstanding their state-law basis.

### B.

Waldman next challenges the bankruptcy court's statutory authority to enter final judgment on Stone's claims. Congress has granted bankruptcy judges differing authority depending on whether a claim in bankruptcy is "core" or not. 28 U.S.C. § 157. In "core proceedings," a bankruptcy judge "may enter appropriate orders and judgments," subject to appellate review in the district court. *Id.* § 157(b)(1). In non-core proceedings, the bankruptcy judge "shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after . . . reviewing de novo" the objections of either party. *Id.* § 157(c)(1).

Waldman contends that Stone's claims were not "core proceedings" under § 157, and thus that the bankruptcy court had no power to enter final judgment with respect to them. Waldman's own pleadings expressly stated, however, that all of Stone's claims in this case were core. (Waldman's Answer to Stone's 1st Am. Compl. ¶ 5.) And this objection—that the bankruptcy court acted beyond its statutory authority under § 157—can be forfeited. *See The Cain Partnership, Ltd. v. Pioneer Inv. Servs. Co.* (*In re Pioneer Inv. Servs. Co.*), 946 F.2d 445, 449–50 (6th Cir. 1991). Thus, Waldman has forfeited his objection under § 157 here. *See Stern v. Marshall*, 131 S. Ct. 2594, 2608 (2011).

## C.

Waldman's more serious argument is that the bankruptcy court lacked constitutional authority to enter judgment on Stone's claims. Article III, § 1 of the Constitution mandates that "[t]he judicial Power of the United States, shall be vested" in courts whose judges "shall hold their Offices during good Behaviour" and "receive for their Services[] a Compensation[] [that] shall not be diminished during their tenure." This requirement—that the federal judicial power be exercised by judges whose tenure and salary is protected—is "an inseparable element of the constitutional system of checks and balances that both defines the power and protects the independence of the Judicial Branch." *Stern*, 131 S. Ct. at 2608 (internal quotation marks omitted).

Bankruptcy judges lack Article III's tenure and salary protections. And Waldman contends that the bankruptcy court exercised Article III "judicial Power" when it entered final judgment here. Thus, Waldman concludes, the judgment against him was entered in violation of the Constitution.

### 1.

Both Stone and the United States, as amicus curiae, respond that Waldman has forfeited this objection too by not raising it below. "Article III, § 1 not only preserves to litigants their interest in an impartial and independent federal adjudication of claims within the judicial power of the United States, but also serves as an inseparable element

of the constitutional system of checks and balances."   *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850 (1986) (internal quotation marks omitted).  The Article III, § 1 guarantee thus has a dual character:  one part personal right of the litigant, one part structural principle.  The argument, as presented by the United States, is that the personal right predominates in cases not involving "the encroachment or aggrandizement of one branch at the expense of the other."  *Id.*  Here, it is undisputed that bankruptcy courts—unlike the Executive agency in *Schor*—are located within the Judicial Branch.  Thus, the United States says, neither the Executive nor the Legislature has encroached upon the Judiciary, which means that Waldman's objection is based upon a waivable "personal right," rather than a non-waivable structural principle.

The argument takes too narrow a view of the interests preserved by Article III.  The issue here is not so much the aggrandizement of the Legislative or Executive Branches, as it is the diminution of the Judicial one.  "Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III."  *Stern*, 131 S. Ct. at 2609.  Article III envisions—indeed it mandates—that the judicial Power will be vested in judges whose tenure and salary are protected as set forth in that Article.  To the extent that Congress can shift the judicial Power to judges without those protections, the Judicial Branch is weaker and less independent than it is supposed to be. *See Schor*, 478 U.S. at 850 (Article III "safeguards the role of the Judicial Branch in our tripartite system by barring congressional attempts to transfer jurisdiction to non-Article III tribunals for the purpose of emasculating constitutional courts").

Waldman's objection thus implicates not only his personal rights, but also the structural principle advanced by Article III.  And that principle is not Waldman's to waive. *See Spierer v. Federated Dep't Stores, Inc.* (*In re Federated Dep't Stores, Inc.*), 328 F.3d 829, 833 (6th Cir. 2003) ("That the Spierers failed to suggest while in bankruptcy court that the stay was imposed in violation of Article III is irrelevant").  We therefore proceed to the merits of his Article III objection.

2.

The adjudication of so-called private rights—historically described as "the liability of one individual to another under the law as defined"—is part of the judicial Power reserved to Article III courts under the Constitution. *Stern*, 131 S.Ct. at 2612. Bankruptcy courts therefore cannot enter final judgments as to claims involving liability between individuals, unless the claim falls within the so-called "public rights" exception to Article III. *Id.* at 2610. A public-rights claim is one that "derives from a federal regulatory scheme, or in which resolution of the claim by an expert governmental agency is essential to a limited regulatory objective within the agency's authority." *Id*. at 2613. Whether Stone's claims involve "public rights" is the issue here.

The law in this area has a potluck quality. In *Stern*, the Court reviewed the line of cases applying the public-rights doctrine to bankruptcy proceedings. 131 S. Ct. at 2609–14. That line begins with *Northern Pipeline*, which held that "the restructuring of debtor-creditor relations"—*i.e.*, the bankruptcy court's power to rule on a debtor's objections to a creditor's proof of claim against the estate—"must be distinguished from the adjudication of state-created private rights," such as, in that case, a debtor's state-law action for contract damages against a non-creditor. 458 U.S. at 71 (plurality opinion). "The former may well be a 'public right,'" the Court said, "but the latter obviously is not." *Id.*

Next came *Granfinanciera*, *S.A. v. Nordberg*, which held that the public-rights doctrine does not allow a bankruptcy court to decide a fraudulent-conveyance claim filed by a bankrupt estate's trustee against a non-creditor. 492 U.S. 33, 55 (1989). By means of such a claim, the estate seeks to recover property that the debtor transferred in anticipation of bankruptcy. Fraudulent-conveyance claims, *Granfinanciera* said, "constitute no part of the proceedings in bankruptcy." *Id.* at 56. They are "quintessentially suits at common law that more nearly resemble state-law contract claims . . . to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." *Id.* Thus, only an Article III court can enter final judgment on such a claim. (*Granfinanciera* actually involved the

limits of the bankruptcy court's equity jurisdiction for Seventh Amendment purposes, not the limits of the bankruptcy court's authority for purposes of Article III. But the Supreme Court stated that the analysis for each is the same. *See id.* at 53–54.)

In contrast, the Supreme Court has twice authorized the bankruptcy courts to decide statutory preference actions brought by trustees against creditors who filed a proof of claim in the bankruptcy. *See Katchen v. Landy*, 382 U.S. 323 (1966); *Langenkamp v. Culp*, 498 U.S. 42 (1990) (per curiam). When a debtor transfers property to a creditor shortly before filing for bankruptcy, the effect is to increase the creditor's share of the estate. Thus, under the bankruptcy statute, if a debtor transfers property to a creditor within a certain period (90 days for most creditors, 1 year for "insiders") before the date of the bankruptcy petition, the trustee of the estate can void the transfer. *See* 11 U.S.C. § 547. *Katchen* held that the bankruptcy court can decide a preference action against a creditor of the estate—even an action that seeks return of property to the estate, rather than only disallowance of the preferred creditor's proof of claim—because the determination whether the creditor received a voidable preference is "part and parcel" of the claims-allowance process. 382 U.S. at 330; *see also Langenkamp*, 498 U.S. at 44.

*Stern* itself involved the estate of Vickie Lynn Marshall (better known as Anna Nicole Smith). One of Vickie's creditors, Pierce Marshall, filed a proof of claim in the bankruptcy. Vickie then counterclaimed, arguing that Pierce had tortiously interfered with her receipt of an inter-vivos gift from Vickie's late husband (Pierce's father). Vickie's counterclaim arose under state tort law. The claim sought to augment her bankrupt estate, not to disallow Pierce's proof of claim. And resolution of Pierce's proof of claim would not resolve the counterclaim, which "raise[d] issues of law entirely different from those" raised by Pierce's proof of claim. *Stern*, 131 S. Ct. at 2617. Vickie's counterclaim therefore concerned private rights, which meant that the bankruptcy court could not enter final judgment with respect to it. *Id*. at 2620.

*Stern* thus provides a summary of the law in this area: When a debtor pleads an action under federal bankruptcy law and seeks disallowance of a creditor's proof of

claim against the estate—as in *Katchen*—the bankruptcy court's authority is at its constitutional maximum. 131 S. Ct. at 2617–18. But when a debtor pleads an action arising only under state-law, as in *Northern Pipeline*; or when the debtor pleads an action that would augment the bankrupt estate, but not "necessarily be resolved in the claims allowance process[,]" 131 S. Ct. at 2618; then the bankruptcy court is constitutionally prohibited from entering final judgment. *Id.* at 2614.

i.

We consider first whether the bankruptcy court was constitutionally permitted to enter final judgment as to Stone's disallowance claims against Waldman. Those claims asked the court to discharge a judgment against Stone, a judgment lien on his property, and a mortgage—all of which, the claims allege, Waldman obtained by fraud. Although those claims have state-law fraud as an element, they arise under the bankruptcy statute. *See* 11 U.S.C. § 502(b) (upon objection to a proof of claim, the bankruptcy court "shall allow such claim . . . except to the extent that . . . such claim is unenforceable against the debtor and property of the debtor, under any . . . applicable law"). Stone sought no affirmative relief with these claims; instead he sought only to prevent Waldman from collecting on Stone's debts or redeeming the accompanying securities. *Cf. Katchen*, 382 U.S. at 329–30 (debtor sued, on the ground of voidable preference, to disallow a creditor's proof of claim). And whereas Vickie's counterclaim in *Stern* raised issues beyond those presented by Pierce's proof of claim, Stone's disallowance claims were part and parcel of the claims-allowance process in bankruptcy. *See Stern*, 131 S. Ct. at 2617. Under *Stern*, therefore, the bankruptcy court was authorized to enter final judgment as to these claims.

(*Granfinanciera* also explains why the bankruptcy court's judgment on Stone's disallowance claims was consistent with the Seventh Amendment: resolving debtor-creditor relations is an equity function that does not bring the right to a jury trial. 492 U.S. at 57–58. Moreover, Waldman waived a jury trial by never asking for one. *See* Fed. R. Bankr. P. 9015(a).)

Waldman responds that this case is distinguishable from *Katchen* and *Langenkamp* because, unlike the creditor-defendants there, he never filed a proof of claim. Thus, he says, he resembles the non-creditor defendants in *Granfinanciera*, whom the Court held could not be sued in bankruptcy court. *See* 492 U.S. at 58–59. Unlike Waldman, however, the *Granfinanciera* defendants were not creditors at all; they had no interest in the bankruptcy proceeding and had been hauled into court against their will. *Id.* at 36–37. Here, Waldman was Stone's principal creditor and surely would have filed a proof of claim if Stone had not beat him to the courthouse with an adversarial proceeding. Indeed it was Waldman's attempt to collect on Stone's debts that pushed Stone into bankruptcy in the first place. Waldman then appeared in the bankruptcy proceeding, counterclaimed, and sought relief from the automatic stay to enforce his security and take possession of Stone's property. It is true, as Waldman points out, that the Court in *Langenkamp* emphasized the consequences of a creditor's decision to file a proof of claim. *See* 498 U.S. at 44–45. Unlike the creditor there, however, Waldman was a secured creditor, so he was not even required to file a proof of claim in order to preserve his right to recover from the estate. *See PCFS Fin. v. Spragin* (*In re Nowak*), 586 F.3d 450, 455 (6th Cir. 2009) (citing 11 U.S.C. § 506; Fed. R. Bankr. P. 3002(a)).

All that said, we recognize that the Supreme Court has never squarely decided whether Article III allows a bankruptcy court to enter judgment on a debtor's objections to a creditor's proof of claim. But neither has the Court ever intimated that Article III bars a bankruptcy court from performing this function—"which is of basic importance in the administration of the bankruptcy estate[.]" *Katchen*, 382 U.S. at 329 (internal quotation marks omitted). All the intimations instead point the other way: in *Northern Pipeline*, for example, the Court said that this function—"the core of the federal bankruptcy power"—"may well be" a matter of public right. 458 U.S. at 71 (plurality opinion). And in *Stern*, the Court explained its result in that case, and in prior ones, partly by reference to whether the claims were practically subsumed in the claims-allowance process. 131 S. Ct. at 2617. We do not read the Court's precedents to require the bankruptcy courts to abandon this power, which they have exercised for more than two centuries. *See* Act of Apr. 4, 1800, ch. 19, 2 Stat. 19 (repealed 1803) (creating the

first federal bankruptcy courts).  We therefore hold that the bankruptcy court here was authorized to enter final judgment on Stone's disallowance claims.

ii.

In contrast, Stone's affirmative claims sought money damages arising from the fraud that Waldman perpetrated on Stone.  Like Vickie's counterclaim in *Stern*, those claims arose exclusively under state law and existed without regard to any bankruptcy proceeding.  *See* 131 S. Ct. at 2618 ("Vickie's claim . . . is in no way derived from or dependent upon bankruptcy law").  And the affirmative claims were not a part of Stone's effort to restructure his relations with his creditors in bankruptcy; rather, they only sought money damages to augment the bankruptcy estate.  *Cf. Granfinanciera*, 492 U.S. at 56 (debtor sued for affirmative relief, on fraudulent-conveyance grounds, to augment the bankrupt estate).

Stone emphasizes that his affirmative claims turn on the same fraudulent conduct as his disallowance claim; and thus, he argues, the bankruptcy court could award damages under *Katchen*.  But *Katchen* does not authorize the bankruptcy court to award money damages on the ground that a claim arises from the same transaction or occurrence as a disallowance claim; "some overlap" between the claims is not enough. *Stern*, 131 S. Ct. at 2617.  Instead, for a bankruptcy court to enter final judgment as to claims that seek an award of money damages to the estate, there must have been, at the outset of the claims-disallowance process, "reason to believe that the process of adjudicating [the] proof of claim would necessarily resolve" the damages claim.  *Id.*

Stone's affirmative claims required him to prove facts beyond those necessary to his disallowance claims.  Those facts included that Waldman had promised to pay off Stone's tax lien and other debts, and to give Stone a forty percent interest in the new company.  Moreover, just as in *Stern*, Stone's request for punitive damages required him to show that Waldman's conduct warranted retribution and deterrence.  *See id.*  Hence there was never any reason to think that Stone's disallowance claims would necessarily resolve his affirmative claims.  The bankruptcy court's judgment with respect to those claims, therefore, was entered in violation of Article III.

iii.

What to do about the violation is another question.  A practical remedy would be simply to direct the bankruptcy court to convert its final judgment as to Stone's affirmative claims into proposed findings of fact and conclusions of law, which the district court would then review de novo.  *Cf.* 28 U.S.C. § 157(c)(1).  In core proceedings, however, § 157(b)(1) authorizes the bankruptcy court to "*enter* appropriate orders and judgments," not to propose them.  (Emphasis added.)  (Of course, one might argue that—in core proceedings as to which Article III bars the bankruptcy courts from entering final judgment—Congress's grant of the greater power to enter final judgments implies a lesser authority to propose them.)  Thus, if Stone's affirmative claims are core, the most practical remedy here is one that the statute does not expressly permit.

But Stone's affirmative claims are not core.  Whether a proceeding is core is determined on a claim-by-claim basis.  *See In re Exide Techs.*, 544 F.3d 196, 206 (3d Cir. 2008).  "A core proceeding either invokes a substantive right created by federal bankruptcy law or one which could not exist outside of the bankruptcy." *Lowenbraun v. Canary*, 453 F.3d 314, 320 (6th Cir. 2006) (internal punctuation omitted).  Neither is true here:  Stone's affirmative claims are based on Kentucky law, not federal bankruptcy law; and he could have filed them as easily before he declared bankruptcy as afterward.  Nor do the claims fall within the types of proceedings listed as core in § 157(b)(2).  Stone's affirmative claims are just ordinary state-law claims for fraud.  Thus they are only "related to" the bankruptcy estate, which means the bankruptcy court may submit proposed findings of fact and conclusions of law for them.  28 U.S.C. § 157(c)(1).

It is true, of course, that both parties alleged in the bankruptcy court (albeit without explanation) that all of Stone's claims are core; and that Waldman therefore waived his right to argue to this court that Stone's affirmative claims are non-core.  But the fortuity of Waldman's waiver of his own rights does nothing to diminish the bankruptcy court's authority under § 157(c)(1).

That is the authority we direct the court to exercise on remand here. The bankruptcy court shall recast its judgment as to Stone's affirmative claims as proposed

findings of fact and conclusions of law, which the district court shall review de novo. In doing so, the district court may "accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions." Fed. R. Bankr. P. 9033(d).

## III.

Waldman challenges the merits of the bankruptcy court's judgment with respect to the disallowance claims. As to those claims, we review the court's factual findings for clear error and its legal conclusions de novo. *Stamper v. United States* (*In re Gardner*), 360 F.3d 551, 557 (6th Cir. 2004). When reviewing for clear error, the question is simply "whether a reasonable person could agree with the bankruptcy court's decision." *Volvo Comm. Fin. LLC the Americas v. Gasel Transp. Lines, Inc.* (*In re Gasel Transp. Lines, Inc.*), 326 B.R. 683, 685–86 (B.A.P. 6th Cir. 2005).

## A.

Waldman argues that the bankruptcy court's fraud determination was against the great weight of the evidence. This argument boils down to a request that we take Waldman's side in a credibility contest. The most important evidence at trial was the testimony of Stone and Waldman. The bankruptcy court was entitled to credit Stone's testimony over Waldman's; and Stone's testimony was enough to support the court's judgment. Waldman's argument is meritless.

Waldman also argues that he cannot be liable for fraud because he became Stone's creditor through a deal with Fifth Third, rather than with Stone. But Waldman used his false promises to induce Stone to transfer STM's assets, which he then used to acquire Stone's indebtedness from Fifth Third. The bankruptcy court reasonably found that Waldman used fraud to become Stone's creditor.

## B.

Waldman also argues that we deny him due process by reviewing the bankruptcy court's factual findings only for clear error—as required by Federal Rule of Bankruptcy

Procedure 8013. This claim is frivolous. The Supreme Court has rejected a virtually identical challenge to Federal Rule of Civil Procedure Rule 52(a). *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–75 (1985).

Next, Waldman argues that Kentucky law does not allow fraud claims based on promises of future performance. *See Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 262 (Ky. Ct. App. 2007). The bankruptcy court's order on the disallowance claims, however, did not enforce Waldman's promise to pay off Stone's debts (that instead is what Stone's affirmative claims sought). Rather, the court simply held that Waldman's fraud defeated his right to collect on Stone's debts or to enforce his securities. Waldman points to nothing in Kentucky law that forbids this relief.

Finally, Waldman argues that the bankruptcy court violated Kentucky's parol-evidence rule and statute of frauds by hearing evidence of the parties' oral negotiations. But fraud is an exception to both doctrines. *See United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 471 (Ky. 1999) (Kentucky law will not permit a party to take advantage of the statute of frauds for the purpose of committing fraud); *Radioshack*, 222 S.W.3d at 260 ("Parol evidence is admissible to show that the making of a contract was procured by fraudulent representations"). So neither applies here.

\*    \*    \*

The bankruptcy court's judgment is affirmed with respect to Stone's disallowance claims. The court's judgment as to Stone's affirmative claims is vacated. On remand, the bankruptcy court shall recast its final judgment as to these claims as proposed findings of fact and conclusions of law, which the district court shall review de novo.