# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 11, 2013

No. 12-51270
Consolidated with No. 12-51279

Lyle W. Cayce
Clerk

In the Matter of: BP RE, L.P.,

Debtor.

------------------------------------------------------------------------

BP RE, L.P.,

Appellant,

versus

RML WAXAHACHIE DODGE, L.L.C.;
RML-MCLARTY-LANDERS AUTOMOTIVE HOLDINGS, L.L.C;
RML WAXAHACHIE FORD, L.L.C; RML WAXAHACHIE GMC, L.L.C.;
RLJ-MCLARTY-LANDERS AUTOMOTIVE GROUP,

Appellees.

Appeals from the United States District Court
for the Western District of Texas

Before SMITH, GARZA, and SOUTHWICK, Circuit Judges.

JERRY E. SMITH, Circuit Judge.

BP RE, L.P. ("BPRE"), filed for Chapter 11 bankruptcy relief and, along

No. 12-51270
No. 12-51279

with BP Automotive, L.P.,[1] filed an adversary complaint in the bankruptcy court alleging various state-law tort and contract claims against multiple RML entities ("RML").[2] The claims related to negotiations between BPRE and RML over the sale and lease of a car dealership and the related property. The bankruptcy court entered a final judgment denying relief, and on appeal the district court, reviewing the findings of fact for clear error and conclusions of law *de novo*, affirmed.

Appealing the judgment of the district court, BPRE argues, on the merits, that RML breached a lease agreement; that undisputed evidence shows that defendants committed fraud; and that several findings were against the great weight of the evidence. Procedurally, BPRE contends that the bankruptcy court (1) failed to rule on some of BPRE's claims; (2) relied on evidence not in the record and failed to apply the proper legal standards; (3) erred in denying a jury trial; and (4) lacked constitutional authority to enter a final, appealable judgment.

Because the bankruptcy court lacked Article III authority to enter final judgment on BPRE's claims, we vacate the district court's judgment and remand to the district court. We thus do not reach the merits of BPRE's appeal.

I.

The Bankruptcy Code was enacted in 1984 in response to *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), which had held the 1978 Bankruptcy Act unconstitutional. Under the 1984 Code, district

---

[1] The court eventually granted defendants' motion to remove BP Automotive, L.P., from the case.

[2] RML Waxahachie Dodge, L.L.C.; RML-McLarty-Landers Automotive Holdings, L.L.C.; RML Waxahachie Ford, L.L.C.; and RLJ-McLarty-Landers Automotive Group.

courts may refer "cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11" to the bankruptcy court. 28 U.S.C. § 157(a).  Bankruptcy judges are appointed by the courts of appeals to fourteen-year terms, 28 U.S.C. § 152(a)(1), and do not receive the constitutional tenure and salary protection of Article III judges, *N. Pipeline*, 458 U.S. at 61.  "In short, there is no doubt that the bankruptcy judges created by the Act are not Art. III judges."  *Id.*

Section 157(b)(1) designates certain cases as "core proceedings" and authorizes a bankruptcy court to "enter appropriate orders and judgments" in such cases.  In a core proceeding, an aggrieved party may appeal the judgment of the bankruptcy court to the district court, which applies a *de novo* standard of review to the conclusions of law and the clearly-erroneous standard to findings of fact.  28 U.S.C. § 158(a).  The Code also gives bankruptcy courts the authority to hear non-core proceedings that are "otherwise related to a case under title 11." § 157(c)(1).  For non-core proceedings, the bankruptcy court submits proposed findings of fact and conclusions of law to the district court, which then reviews the submissions *de novo*.  *Id.*  With consent of the parties, however, the bankruptcy court may enter final, appealable judgments in non-core proceedings. § 157(c)(2).

## II.

BPRE's adversary complaint stated that the proceedings were "non-core." BPRE also requested "judgment, after trial or final hearing," on the claims against RML.  BPRE filed, on the same day, a "Statement Regarding Consent" that noted that it sought "monetary damages for breach of contract, tortious interference, and trespass claims, among others."  BPRE again acknowledged that "[t]his matter is not a proceeding identified as a core proceeding in

No. 12-51270
No. 12-51279

28 U.S.C. § 157(b)(2).  Therefore, this matter is a non-core proceeding but is related to the bankruptcy in that any recovery on the claims brought by the debtor will go directly to the estate . . . .  Plaintiffs consent to the entry of a final order by this court."

BPRE requested a pretrial conference and demanded a jury trial.  In the request, BPRE noted that it had submitted, as required, in its Statement Regarding Consent, whether it consented to the entry of a final judgment by the bankruptcy court in a non-core proceeding.  The Joint Pretrial Order also acknowledged that this was a non-core proceeding and that BPRE consented to the entry of a final judgment.

BPRE's request for a jury trial was denied as untimely.  It then moved to withdraw the reference to the bankruptcy court, asking the district court instead to hear the case in the first instance.  Not only did BPRE seek to preserve its jury demand, but it stated that it "does not consent to the Bankruptcy Court entering a final order or judgment in any non-core proceeding or conducting a jury trial."

BPRE maintained that the district court should withdraw the reference for reasons of judicial economy, given that BPRE had not consented to final judgment and the district court would have to conduct *de novo* review.  The district court denied the motion, holding that because the matter had already been litigated in the bankruptcy court for over six months, it would not be a waste of resources to continue there.

BPRE filed a response to defendants' motions for partial summary judgment. The case was tried without a jury, and the bankruptcy court entered final judgment denying all of BPRE's claims.  On appeal, the district court affirmed in part and vacated in part, reviewing the bankruptcy court's findings of fact for clear error and conclusions of law *de novo*.  On remand, the bankruptcy court

4

again denied BPRE relief and entered judgment. On a second appeal, the district court affirmed, applying the same standard of review as before.

## III.

### A.

In striking down the Bankruptcy Act of 1978 in *Northern Pipeline*, 458 U.S. at 57–60,[3] the plurality took the opportunity to examine and discuss the Framers' division of power between the branches and the importance of the Federal Judiciary's independence from the Executive and Legislative Branches. "Art. III both defines the power and protects the independence of the Judicial Branch." *Id.* at 58. Only courts satisfying the requirements of Article III may exercise the federal judicial power. *Id.* at 59. "In sum, our Constitution . . . commands that the independence of the Judiciary be jealously guarded, and it provides clear institutional protections for that independence." *Id.* at 60.

In *Northern Pipeline*, the Court acknowledged that at times the courts have allowed non-Article III courts to hear cases, although "these precedents represent no broad departure from the constitutional command that the judicial power of the United States must be vested in Art. III courts." *Id.* at 64. The plurality characterized three narrow exceptions: territorial courts, military courts, and the adjudication of "public rights." *Id.* at 64–68.[4] Rejecting the notion that the state common-law claims at issue in *Northern Pipeline* could be deemed matters of public right, the Court found them to be strictly private

---

[3] Northern Pipeline filed for bankruptcy and then sued Marathon for contract and tort damages. Marathon sought to dismiss the suit, arguing that the bankruptcy court, a non-Article III court, did not have the authority to decide the case.

[4] In his controling concurrence, Justice Rehnquist declined to categorize the three Article III exceptions as the plurality did but concluded that regardless, "[n]one of the cases has gone so far as to sanction the type of adjudication" at issue. *N. Pipeline*, 458 U.S. at 91 (Rehnquist, J., concurring).

rights, which "lie at the core of the historically recognized judicial power." *Id.* at 70. Although claims that go to the debtor-creditor relationship—and thus affect the federal bankruptcy power—may be a matter of public rights, *id.* at 71, state-created rights—such as contract or tort claims—are private rights concerning "the liability of one individual to another under the law," *id.* at 71–72.

Concluding that the bankruptcy courts do not fit under any of the narrow historical exceptions, the Court was unable to "discern any persuasive reason, in logic, history, or the Constitution, why the bankruptcy courts here established lie beyond the reach of Art. III." *Id.* at 76. Similarly, the Court rejected the suggestion that bankruptcy courts, issuing final judgments and exercising "the essential attributes" of Article III courts, could be deemed mere adjuncts of the district courts. *Id.* at 80–81; *see also id.* at 85–86.

## B.

In *Stern v. Marshall*, 131 S. Ct. 2594 (2011), the Court was again faced with whether the bankruptcy court's statutory authority was authorized by Article III. Although Congress had reformed the Bankruptcy Act as a result of *Northern Pipeline*,[5] the authority available to bankruptcy courts to decide core claims was not that different from that conferred on them under the 1978 Act. *Id.* at 2611. In *Stern*, the Court determined that the bankruptcy court lacked the constitutional authority to enter final judgment on the debtor's state-law counterclaim even though the statute conferred such authority. *Id.* at 2620.

In *Stern*, the publicly prominent Anna Nicole Smith (also known as Vickie Lynn Marshall) initiated a lengthy parade through federal and state courts in an attempt to claim some of her deceased husband's estate. Though she is well

---

[5] *See* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. 98-353, 98 Stat. 340 (July 10, 1984).

known in pop culture, bankruptcy law and casebooks will remember her for a different reason. The case began when J. Howard Marshall, her husband, failed to include her in his will, causing her to sue Howard's son, Pierce, in Texas probate court for fraudulent inducement. *See id.* at 2601. Vickie Lynn filed for bankruptcy in California, whereupon Pierce filed a defamation complaint against her in the bankruptcy court, seeking to recover from her bankruptcy estate. Vickie Lynn counterclaimed for tortious interference. *See id.* After she was awarded about $525 million in damages, Pierce argued that the bankruptcy court lacked authority to issue a final judgment on the counterclaim. The case then came before the Supreme Court for the second time. *Id.*

Determining that the counterclaim was a core proceeding, the Court acknowledged that the *statute* allowed the bankruptcy court to issue a final judgment. *Id.* at 2604. The Court next examined the *constitutional* problems with that authority, especially in the wake of *Northern Pipeline*. The bankruptcy court had issued a final judgment on a state common-law claim that did "not flow from a federal statutory scheme," was not dependent on the adjudication of a federal right, and was not in the realm of public rights. *Id.* at 2610–11, 2614.

Again, the Court emphasized the importance of our triparte system and separation of powers, stressing that the system of checks and balances exists to serve "two related purposes": to protect the independence of each branch and to protect the individual citizen. *Id.* at 2609. The bankruptcy courts, acting not as adjuncts but exercising the core judicial power, undermine the independence of the Judiciary where the Executive and Legislative Branches may confer judicial power on courts that do not have the tenure and salary protection of Article III, Section 1. *Id.* (citing *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272 (1856)).

The Court underlined the significance of guarding Article III powers:

No. 12-51270
No. 12-51279

> When a suit is made of "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," *Northern Pipeline*, 458 U.S., at 90 . . . (Rehnquist, J., concurring in judgment), and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts. The Constitution assigns that job—resolution of "the mundane as well as the glamorous, matters of common law and statute as well as constitutional law, issues of fact as well as issues of law" —to the Judiciary. *Id.*, at 86-87, n.39 . . . (plurality opinion).

*Id.* at 2609. The Court concluded that "Congress, in one isolated respect, exceeded [the Article III] limitation in the Bankruptcy Act of 1984. The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 2620.

IV.

A.

In considering whether the bankruptcy court had *constitutional* authority to enter final judgment on BPRE's state common-law claims, we first ask—in the interest of constitutional avoidance[6]—whether the court had *statutory* authority. The parties do not dispute that BPRE's claims against RML were non-core proceedings, which usually require the bankruptcy court to enter findings and conclusions for the district court to review. § 157(c)(1). But, with the consent of the parties, the district court may refer a case to the bankruptcy court "to hear and determine and to enter appropriate orders and judgments." § 157(c)(2).

---

[6] *See Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (referring to the "usual reluctance to decide constitutional questions unnecessarily"); *Harris v. McRae*, 448 U.S. 297, 306–07 (1980) ("[I]f a case may be decided on either statutory or constitutional grounds, this Court . . . will inquire first into the statutory question."); *St. Joseph Abbey v. Castille*, 712 F.3d 215, 220 (5th Cir. 2013) (invoking "constitutional avoidance"), *cert. denied*, 2013 U.S. LEXIS 7438 (U.S. Oct. 15, 2013).

No. 12-51270
No. 12-51279

Assuming the parties consented, the bankruptcy court's entry of final judgment was appropriate under the *statute*. Only BPRE maintains that it did not consent; RML, although it never expressly consented, does not dispute that it did.[7] BPRE expressly consented in its adversary complaint but contends that it withdrew that consent and never reinstated it.

Whereas BPRE withdrew consent before final judgment—after which many courts seem to agree is too late—there is no doubt that it chose to file the claims in the bankruptcy court, expressly consented to the entry of a final judgment there, and sought to revoke the consent only after it was denied a jury. Considering the judicial concern with gamesmanship, we conclude that BPRE consented to the bankruptcy court's authority: "[T]he consequences of a litigant sandbagging the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor—can be particularly severe." *Stern*, 131 S. Ct. at 2608 (internal quotations and alterations omitted). With the parties' consent, the bankruptcy court was *statutorily* authorized under § 157(c)(2) to issue a final judgment.

B.

Turning to whether the bankruptcy court had the *constitutional* authority to enter final judgment, we are bound to apply *Stern*, which held that, regardless of statutory authority, the bankruptcy court did not have the constitutional

---

[7] Ample caselaw addresses what is required to demonstrate consent and whether it can be implied through behavior or must be express. *See, e.g., Abramowitz v. Palmer*, 999 F.2d 1274, 1279–80 (8th Cir. 1993); *In re G.S.F. Corp.*, 938 F.2d 1467, 1476–77 (1st Cir. 1991); *Mann v. Alexander Dawson Inc. (In re Mann)*, 907 F.2d 923, 926 (9th Cir. 1990); *Men's Sportswear, Inc. v. Sasson Jeans, Inc. (In re Men's Sportswear, Inc.)*, 834 F.2d 1134, 1137–38 (2d Cir. 1987); *DuVoisin v. Foster* (*In re S. Indus. Banking Corp.*), 809 F.2d 329, 331 (6th Cir. 1987); *Sheridan v. Michaels (In re Sheridan)*, 362 F.3d 96 (1st Cir. 2004). Some of these cases however, were decided before the promulgation of Federal Rule of Bankruptcy Procedure 7008, which includes an advisory note requiring express consent.

authority to enter a final judgment on claims that are so deeply at the heart of the federal judiciary's Article III powers and are not necessary to the resolution of the bankruptcy estate. "What is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment by a court with broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon any agency regulatory regime." *Stern*, 131 S. Ct. at 2615.

Construing *Stern*, the Sixth Circuit convincingly reached a similar conclusion involving non-core claims in *Waldman v. Stone*, 698 F.3d 910, 919 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 1604 (2013): "[W]hen a debtor pleads an action arising only under state-law, as in *Northern Pipeline*; or when the debtor pleads an action that would augment the bankrupt estate, but not 'necessarily be resolved in the claims allowance process[,]' [*Stern*,] 131 S.Ct. at 2618; then the bankruptcy court is constitutionally prohibited from entering final judgment."

Thus, in *Stern* the state-law basis of Vickie Lynn's counterclaim was not the dispositive factor; instead, the Court focused on whether the claim was central to the bankruptcy process.[8] Importantly, the fact that the claim, if successful, would "augment the bankruptcy estate," *Stern*, 131 S. Ct. at 2618 (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 (1989)), did not create a sufficient nexus to the resolution of the bankruptcy proceeding. "Vickie's claim . . . is in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding." *Id.* Thus, "Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue

---

[8] By that logic, the same result would obtain if the claim, instead of being based in state statutory or common law, were grounded in a right conferred by federal statute or the U.S. Constitution independent of the federal bankruptcy scheme. But we do not reach that question here.

stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id.*

To the same effect, in the wake of *Stern*, the Ninth Circuit, in *Executive Benefits Insurance Agency v. Arkison (In re Bellingham Insurance Agency, Inc.)*, 702 F.3d 553, 562 (9th Cir. 2012), *cert. granted*, 133 S. Ct. 2880 (2013), held that "the Trustee's fraudulent conveyance claims are not matters of 'public right,' and *ipso facto*, cannot be decided outside the Article III courts."  Where the "legal action need not necessarily have been resolved in the course of allowing or dis-allowing the claims against the . . . estate . . . . the claim belonged in an Arti-cle III court." *Id.* at 564–65.  Despite that stringent limitation on the bankruptcy court's powers, however, the court opined that "by failing to object until the case reached this court," the appellant "consented to the adjudication of the . . . claim by a bankruptcy judge." *Id.* at 556.

## C.

Agreeing with the Sixth and Ninth Circuits that the bankruptcy court lacked the constitutional authority to enter final judgment on BPRE's state-law claims, we must address whether BPRE's consent to have its claims heard in bankruptcy court cures the constitutional deficiency.  We adopt the compelling and thorough reasoning of *Waldman*, which held that parties cannot consent to such circumvention of Article III that impinges on the structural interests of the Judicial Branch.[9]  *Waldman* was the first post-*Stern* appellate decision to

---

[9] We are not limited by the *dictum* in *McFarland v. Leyh* (*In re Texas General Petrol-eum Corp.*), 52 F.3d 1330, 1337 (5th Cir. 1995), which not only was pre-*Stern* but also offered only a one-sentence reflection on the ability of an individual to waive his *personal* constitu-tional right, which we do not reject.  The holding was based on the statutory right to consent to judgment in bankruptcy court.

address consent as it relates to the bankruptcy court's constitutional authority.[10] The Sixth Circuit persuasively rejected the notion that the constitutional issue could be waived.

In *Waldman*, the court looked both to *Stern* and to *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986), concluding that this issue implicates Article III's structural interests. Article III, Section 1 not only seeks to preserve individual litigants' right to an independent judiciary but also "serves as an inseparable element of the constitutional system of checks and balances." *Waldman*, 698 F.3d at 917 (quoting *Schor*, 478 U.S. at 850). The court rejected the theory that, because the bankruptcy courts are part of the Judicial Branch, there was no threat of encroachment but only a waivable personal right. *Id.* at 917–18.

The *Waldman* court emphasized that the bankruptcy court's entry of final judgment on these types of claims engaged Article III's structural interests: "The issue here is not so much the aggrandizement of the Legislative or Executive Branches, as it is the diminution of the Judicial one." *Id.* at 918. "To the extent that Congress can shift the judicial Power to judges without [the salary and tenure] protections, the Judicial Branch is weaker and less independent than it is supposed to be." *Id.* (citing *Schor*, 478 U.S. at 850). "Waldman's objection thus implicates not only his personal rights, but also the structural principle advanced by Article III. And that principle is not Waldman's to waive." *Id.*

---

[10] The instant case is similar to *Waldman* in all critical respects. There, Stone was the debtor and brought the adversarial action in dispute, although Waldman challenged the authority on appeal. *Waldman*, 698 F.3d at 915. In his filings in bankruptcy court, Waldman accepted that Stone's claims were core claims. *Id.* at 917. Although BPRE stated that its claims were non-core, the cases are similar, because BPRE expressly agreed (at least at first) for the claims to be treated as core claims with a final order. Waldman however, did not object to the entry of final judgment, and thus he forfeited his argument, at least as to the statutory authority. *Id.* BPRE, on the other hand, raised the point before judgment, even if it had initially consented to issuance of a final order.

No. 12-51270
No. 12-51279

We acknowledge that the Ninth Circuit's opinion in *Executive Benefits* is in conflict on the issue of consent. We do not dispute that parties may waive constitutional rights, *Schor*, 478 U.S. at 848–49, but *Executive Benefits* disregards the critical structural interests underlying Article III. It does so by reasoning that *Stern* allowed waiver—that is, that Pierce Marshall waived the jurisdictional argument by filing his defamation claim in the bankruptcy court and never contesting that court's authority over the claim. That line of reasoning in *Executive Benefits* misses the mark, however, because *Stern* determined only that Pierce had waived the issue of *statutory* authority, *see Stern*, 131 S. Ct. at 2608, and did not reach the constitutional issue as to waiver.

Although *Schor* observed that previous decisions had "intimated" that Article III, Section 1 is "primarily" concerned with individual litigants, the Court has also acknowledged Article III's structural interests, especially in this precise context. *See id.* at 2609. "In establishing the system of divided power in the Constitution, the Framers considered it essential that the judiciary remain truly distinct from both the legislature and the executive." *Id.* at 2608 (quoting The Federalist No. 78, p. 466 C. Rossiter ed. 1961) (A. Hamilton)); *see also N. Pipeline*, 458 U.S. at 57–61.

In *Schor* the Court instructed that in determining whether Article III's structural interests are implicated, we consider several non-dispositive factors, including

> the extent to which the 'essential attributes of judicial power' are reserved to Article III courts, and, conversely, the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III.

*Schor*, 478 U.S. at 851. Allowing bankruptcy courts to enter final judgments on state-law claims that are not necessary to address the bankruptcy issues confers

the "essential attributes of judicial power" on non-Article III courts. Nor does § 157(c) affect the authority of the bankruptcy court to decide those claims crucial to bankruptcy cases. In addition, no one disputes here the bankruptcy court's ability to continue to issue findings of fact and conclusions of law on related issues. The decision "does not change all that much." *Stern*, 131 S. Ct. at 2620.

Where a structural interest is triggered, "the parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III, § 2." *Schor*, 478 U.S. at 851. "When these Article III limitations are at issue, notions of consent and waiver cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect." *Id.*[11]

## V.

Based therefore on our adoption of the compelling reasoning in *Waldman*, we are comfortable in concluding that the bankruptcy court was without constitutional authority to enter a final, appealable judgment on BPRE's claims. Our

---

[11] Nothing here is not in conflict with *Technical Automation Services Corp. v. Liberty Surplus Insurance Corp.*, 673 F.3d 399 (5th Cir. 2012), which addressed whether *Stern* affects the authority of magistrate judges, under Article III, to enter final judgments where consent is given under 28 U.S.C. § 636(c). This court relied on *Puryear v. Ede's Ltd.*, 731 F.2d 1153, 1154 (5th Cir. 1984) (which in turn had relied on *Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc.*, 725 F.2d 537 (9th Cir. 1984) (en banc)), which held that the Magistrates Act is "saved from any constitutional infirmity by its requirement that all parties consent to such transfer and by the power of the district court to vacate the reference to the magistrate on its own motion." *Technical Automation*, 673 F.3d at 405. In *Technical Automation*, we determined that *Stern* did not unequivocally overrule *Puryear* or the authorities cited therein, *id.* (citing *Martin v. Medtronic, Inc.*, 254 F.3d 573, 577 (5th Cir. 2001)), and that although there are similarities between the magistrate-judge and bankruptcy statutory schemes, they are distinct, and *Stern*'s was a narrow holding not affecting magistrate judges, *id.* at 407. The court acknowledged that "this constitutional question may be seen in a different light post *Stern*." *Id.*

No. 12-51270
No. 12-51279

confidence in that decision is significantly bolstered by a decision of this court issued after we heard oral argument.

In *Frazin v. Haynes & Boone, L.L.P. (In re Frazin)*, 732 F.3d 313 (5th Cir. 2013), we held that, under *Stern*, the bankruptcy court lacked constitutional authority to enter final judgment on certain state-law counterclaims by the debtor, despite that the debtor had impliedly consented to the bankruptcy court's jurisdiction. We reasoned that *Stern*'s jurisdictional limitation on bankruptcy courts applied there because "*Stern* clearly grounded its reasoning in principles that are broad in scope." *Id.* at 319.[12]

Frazin filed a Chapter 13 bankruptcy petition, then sued in state court asserting unrelated common-law theories and obtained the bankruptcy court's permission to hire a law firm to prosecute that claim. Frazin was discharged from bankruptcy, but the proceeding was held open because, under the Chapter 13 plan, part of the potential recovery from the state-court suit would be used to help satisfy unsecured claims. Frazin won a large jury award, and the bankruptcy court gave him permission to hire a different firm for the appeal, with its fees to be paid on application to the bankruptcy court; the court ordered that any proceeds from the suit would be held in trust by the appellate firm pending the court's direction as to using those sums to satisfy remaining bankruptcy claims.

Frazin won a partial victory on appeal, and the two law firms applied for fees. In response, Frazin filed state-law counterclaims against the firms as core proceedings in the bankruptcy court for, *inter alia*, violations of the Texas Deceptive Trade Practices Act ("DTPA"). The bankruptcy court entered a final judgment that denied that claim and awarded fees, and Frazin appealed to the district court, which affirmed.

---

[12] Each side was permitted to file two letter briefs addressing the applicability of *Frazin* to this proceeding. So although it was not discussed at oral argument, the relevance of *Frazin* has been subjected to adversarial testing.

15

On appeal to this court, Frazin maintained that under *Stern*, the bankruptcy court lacked authority to enter final judgment on his counterclaim. This court agreed. Though recognizing that *Stern* dealt with different facts and a different statutory section and that the *Stern* "Court stated that its decision was 'narrow,'" *id.* at 318 (quoting *Stern*, 131 S. Ct. at 2620), the *Frazin* panel concluded that *Stern*'s "reasoning was sweeping," *id.* at 318–19:

> In explaining its holding, the Court discussed the importance of Article III in maintaining separation of powers among the branches of government, safeguarding the independence of the judicial branch, and protecting litigants. The Court stated that "[w]hen a suit is made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789, and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts. The Court concluded with a holding that was notable for its repetition throughout the opinion: bankruptcy courts "lack[] the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim.

*Id.* at 319 (citations omitted).

Comparing the proceedings in *Stern* to those in *Frazin*, the *Frazin* panel reasoned that

> [t]he court's concern for separation of powers and the independence of the judiciary is equally as sharp with respect to the state-law counterclaims brought by Frazin as it was with the counterclaim brought by Vickie in *Stern*. Based on the reasoning in the opinion, we see no basis for treating Frazin's state-law counterclaims . . . any differently than the Court treated Vickie's counterclaim."

*Id.* (footnote omitted). The court rejected the contention that Frazin consented to the bankruptcy court's jurisdiction and waived objection by filing his claims there, observing that when

> "separation of powers is implicated in a given case, the parties cannot by consent cure the constitutional difficulty . . . . When these Article III limitations are at issue, notions of consent and waiver

cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect."

*Id.* at 320 n.3 (quoting *Schor*, 478 U.S. at 850-51) (brackets in *Frazin*). "Thus, structural concerns cannot be ameliorated by Frazin's consent or waiver." *Id.*

To determine whether the DTPA claim could be finally ruled upon by the bankruptcy court, *Frazin* employed "the test from *Stern* to determine whether any of these counterclaims would necessarily have been resolved in the claims-allowance process." *Id.* at 320 (footnote omitted). The court answered that question in the negative "[b]ecause it was not necessary to decide the DTPA claim to rule on the Attorneys' fee applications," *id.* at 323, such fee applications being matters that were properly before the bankruptcy court for final judgment under *Stern*.

In contending that *Stern* and *Frazin* have no applicability to the instant matter, appellees' counsel correctly notes that both *Stern* and *Frazin* involved core proceedings, but we are faced with a non-core proceeding. The reasoning of *Stern* and *Frazin*, however, apply equally here. The similarities between a state-law counterclaim and a state law claim—both brought in the bankruptcy court—are striking. In both, the debtor brings claims seeking to enlarge the bankruptcy estate. Under *Stern*'s "reasoning in principles that are broad in scope," *Frazin*, *id.* at 319, if, as BPRE points out in its supplemental letter brief, a bankruptcy court "lacked the constitutional authority [for] a state law counter-claim that is not resolved in the process of ruling on a creditor's proof of claim," *Stern*, 131 S. Ct. at 2620, it also would not have constitutional authority over a state-law claim merely because it was not a counterclaim. Under *Stern*'s "rea-soning [that] was sweeping," *Frazin*, 732 F.3d at 318–19, the core/non-core con-tention urges a distinction without a difference for purposes of Article III.

With regard to consent in light of *Frazin*, the appellees, in their supple-

mental letter brief, maintain that the scheme for non-core claims in § 157(c) is meaningfully different from the scheme for core claims in §157(b) because, as the appellees urge,

> [u]nlike the exclusive jurisdiction provided to the bankruptcy courts in [§] 157(b) at issue in *Stern* and *Frazin*, however, [§] 157(c) reserves jurisdiction for final judgments for "related claims" to the Article III district courts, with further authority for the district courts to refer certain matters to the bankruptcy courts with the consent of the parties . . . . [T]he authority to retain or refer matters under [§] 157(c) remains with the district courts.

That argument fails. Although the district court does have the authority to retain, the bankruptcy court lacks constitutional authority to enter a final judgment if the district court does not retain and the reference is not withdrawn. And once entered, a purported judgment of the bankruptcy court—"the entry of a final, binding judgment *by a court* with broad substantive jurisdiction," *Stern*, 131 S. Ct. at 2615—would be entitled to the usual deference (for example, the clearly-erroneous standard for factual findings) owed to such an act that is final, "subject to review only if a party chooses to appeal," *id.* at 2619, to a higher, Article III tribunal.

In *Stern*, *id.* at 2620, the Court noted the efficacy of having bankruptcy courts submit proposed findings and conclusions but admonished that "such judges should not be in the business of entering final judgments in the first place," *id.* at 2619. The Court agreed with Pierce Marshall's argument that, as to such proceedings that only seek to augment the bankruptcy estate, "it must be the district court that finally decides them." *Id.* at 2620 (internal quotation omitted, bracket in original).

## VI.

In sum, although the strict holding of *Stern* limits bankruptcy-court

authority "in one isolated respect" and "the question presented [was] a narrow one, *id.*, its "sweeping" reasoning, *Frazin*, 732 F.3d at 319, is broad and logically must be applied to BPRE's claims here. Accordingly, we VACATE the judgment of the district court and REMAND to that court for further appropriate proceedings. Because no party disputes that BPRE's claims are not core proceedings, the bankruptcy court has the authority conferred by § 157(c)(1) to issue proposed findings of fact and conclusions of law as to BPRE's state-law claims that are related to the bankruptcy estate in the event the district court elects to refer the matter to the bankruptcy court for that limited purpose. *See Waldman*, 698 F.3d at 922. We impose no limitations on what actions the district court may take on remand that are consistent with this opinion.