Opinion for the Court by Circuit Judge ROGERS.
Concurring opinion by Circuit Judge TATEL.
Dissenting opinion by Circuit Judge HENDERSON.
ROGERS, Circuit Judge:
Pursuant to the Military Commissions Act of 2006, 10 U.S.C. §§ 948a et seq. (“2006 MCA”), a law of war military commission convened at Guantanamo Bay, Cuba, found Ali Hamza Ahmad Suliman al Bahlul guilty of material support for terrorism, solicitation of others to commit war crimes, and inchoate conspiracy to commit war crimes. The court, sitting en banc, vacated Bahlul’s convictions for material support and solicitation as violative of the Ex Post Facto Clause of the U.S. Constitution, see Bahlul v. United States, 767 F.3d 1 (D.C.Cir.2014), and remanded Bahlul’s remaining challenges to his conspiracy conviction to the original panel, see id. at 31. Bahlul contends that his inchoate conspiracy conviction must be vacated because: (1) Congress exceeded its authority under Article I, § 8 of the Constitution by defining crimes triable by military commission that are not offenses under the international law of war; (2) Congress violated Article III of the Constitution by vesting military commissions with jurisdiction to try crimes that are not offenses under the international law of war; (3) the government put his thoughts, beliefs, and ideas on trial in violation of the First Amendment of the Constitution; and (4) the 2006 MCA discriminates against aliens in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.
Because Bahlul’s challenges include a structural objection under Article III that cannot be forfeited, see Commodity Futures Trading Comm’n v. Schor, 478 U.S. 833, 850-51, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), we review that challenge de novo, and we conclude, for the following reasons, that his conviction for inchoate conspiracy must be vacated.
I.
Bahlul contends that the jurisdiction of law of war military commissions is, under the Constitution, limited to offenses under the international law of war, and thus that Congress has encroached upon the Article III judicial power by authorizing Executive Branch tribunals to try the purely domestic crime of inchoate conspiracy. As a threshold matter, the government maintains that Bahlul has forfeited the Article III challenge, having failed to raise the argument at his trial before the military commission. Bahlul’s challenge, however, presents a structural violation of Article III and is not waivable or forfeita-ble.
The Supreme Court held in Schor that an Article III structural claim of encroachment on the judicial power was not subject to waiver. Id. at 850-51, 106 S.Ct. 3245. The Court explained that “Article III, § 1, not only preserves to litigants their interest in an impartial and independent federal adjudication of claims within the judicial power of the United States, but also serves as an inseparable element of the constitutional system of checks and balances.” Id. *4 at 850, 106 S.Ct. 3245 (internal quotation marks omitted). Further, the Court explained, it “safeguards the role of the Judicial Branch in our tripartite system by barring congressional attempts to transfer jurisdiction to non-Article III tribunals for the purpose of emasculating constitutional courts, and thereby prevent[s] ‘the encroachment or aggrandizement of one branch at the expense of the other.’ ” Id. (quoting Buckley v. Valeo, 424 U.S. 1, 122, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)) (alterations and some internal quotation marks omitted). The Court held:
To the extent that this structural principle is implicated in a given case, the parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III, § 2. When these Article III limitations are at issue, notions of consent and waiver cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect.
Id. at 850-51, 106 S.Ct. 3245 (internal citation omitted). As a result, even though Schor had consented to adjudication of his state-law claim by an Article I tribunal, see id. at 849-50, 106 S.Ct. 3245, the Supreme Court analyzed his structural challenge de novo, see id. at 851-57, 106 S.Ct. 3245.
The Court reaffirmed Schor’s analysis in Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), explaining that it was consistent with a rule that although res judicata claims were waivable, courts had discretion to excuse the waiver. See id. at 231-32, 115 S.Ct. 1447. Accordingly, this court, as well as every other circuit court to address the issue, has held that under Schor a party “could not ... waive his ‘structural’ claim” under Article III. Kuretski v. Comm’r of Internal Revenue Serv., 755 F.3d 929, 937 (D.C.Cir.2014) (emphasis added); see In re BP RE, L.P., 735 F.3d 279, 287-90 (5th Cir.2013); Wellness Int’l Network, Ltd. v. Sharif, 727 F.3d 751, 769 (7th Cir.2013) (rev’d on other grounds); Waldman v. Stone, 698 F.3d 910, 917-18 (6th Cir.2012). Most recently, in Wellness International Network, Ltd. v. Sharif, — U.S. -, 135 S.Ct. 1932, 191 L.Ed.2d 911 (2015), the Supreme Court again confirmed that “Schor forbids [] using consent to excuse an actual violation of Article III.” Id., 135 S.Ct. at 1945 n. 10; see id. at 1942-43, 1943-44; accord id. at 1956 (Roberts, C.J., dissenting).
Of course, the issue before us is not waiver but forfeiture. See generally United States v. Olano, 507 U.S. 725, 733-34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). The Supreme Court’s analysis of waiver in Schor applies to forfeiture as well. There, the Court rejected waiver of Article III § 1 claims “for the same reason” that parties cannot waive Article III § 2 jurisdictional limitations, 478 U.S. at 851, 106 S.Ct. 3245, which are not subject to forfeiture, see United States v. Cotton, 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002). The Court cited United States v. Griffin, 303 U.S. 226, 229, 58 S.Ct. 601, 82 L.Ed. 764 (1938), where it had addressed de novo a subject-matter jurisdiction challenge that the defendants had failed to raise in the district court. In Schor, the Court explained that the analogy stems from the fact that both “Article III limitations ... serve institutional interests that the parties cannot be expected to protect.” 478 U.S. at 851, 106 S.Ct. 3245. As four Justices observed in Freytag v. Comm’r of Internal Revenue, 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991), “[i]t is clear from our opinion in Schor that we had the analogy to Article III subject-matter jurisdiction in mind.” Id. at 897,106 S.Ct. 3245 (Scalia, J., joined by O’Connor, Kennedy, *5 and Souter, JJ., concurring in part and concurring in the judgment). Likewise in Stern v. Marshall, — U.S. -, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), the Court analyzed de novo a structural Article III challenge to a bankruptcy court’s jurisdiction even though that challenge had not been raised in the bankruptcy court. Id. at 2601-02, 2608-20. Again in Sharif, the Court reviewed the structural Article III issue de novo, even though the claim had not been raised in the bankruptcy court or the district court. See Sharif, 135 S.Ct. at 1941, 1944-46. We therefore hold that under Schor’s analysis, Bahlul’s structural challenge under Article III is not subject to forfeiture.
Such searching, de novo review is appropriate because Bahlul’s Article III challenge implicates the power of the political branches to sideline the federal courts. “Trial by military commission raises separation-of-powers concerns of the highest order.” Hamdan v. Rumsfeld, 548 U.S. 557, 638, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (Kennedy, J., concurring in part). “Every extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts.... ” Reid v. Covert, 354 U.S. 1, 21, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality op.). The government has conceded, in light of Schor, that to the extent Bahlul raises a structural challenge, it is subject to de novo-review. See Appellee’s Br. 50; Oral Arg. Tr. 29, 30. It mistakenly suggests, however, that Bahlul’s Article III challenge asserts only his personal right to a jury trial, which is subject to forfeiture and thus plain error review. See Appellee’s Br. 49-50. This ignores Part II of Bahlul’s brief where he discusses the “judicial power” and relies on Article III structural precedent of the Supreme Court in maintaining that “[t]his [cjourt must be sure that the political branches are not seeking to ‘chip away at the authority of the Judicial Branch.... ‘Slight encroachments create new boundaries from which legions of power can seek new territory to capture.’ ’ ” Appellant’s Br. 27 (quoting Stern, 131 S.Ct. at 2620 (quoting Reid, 354 U.S. at 39, 77 S.Ct. 1222 (plurality op.))); see id. at 27-37; Reply Br. 20.
Our dissenting colleague misreads Schor in maintaining that its holding, quoted above, does not speak to waivability or forfeitability at all. Dis. Op. 33-37. To the contrary, the Supreme Court, at that point in its opinion, was addressing the distinction between the waivability of the right component and the structural component of Article III § 1, and concluded that only the former was waivable. See Schor, 478 U.S. at 848-51, 106 S.Ct. 3245. The Court reiterated that distinction in Sharif, 135 S.Ct. at 1942-43, 1943-44, and emphasized that Schor “forbids” waiver of the latter, id. at 1945 n. 10. The dissent suggests that Schor’s non-waiver holding applies only to substantive rights, not arguments. See Dis. Op. 36-37. But the analysis in Schor applied to both “consent and waiver,” 478 U.S. at 851, 106 S.Ct. 3245 (emphasis added), and later Supreme Court precedent confirms that Schor’s hon-waiver holding applies to “defense[s],” “doctrinefs],” “challenge[s],” and “elaim[s],” not just rights, Plant, 514 U.S. at 231-32, 115 S.Ct. 1447. Indeed, the discussion in Plant about excusing waiver in the res judicata context would make little sense if waiver meant there was no violation in the first place. See id. at 231, 115 S.Ct. 1447. Under Schor and Sharif, parties can waive neither a separation-of-' powers violation nor a separation-of-powers challenge. Our colleague also confuses Sharif’s analysis by conflating the individual right and the structural interest protected by Article III § 1. See Dis. Op. 34-36. Each acknowledgment of waivability *6 in the Court’s opinion refers to the individual right. See Sharif, 135 S.Ct. at 1938-39, 1942-43, 1943-44, 1944-45, 1947, 1948 & n. 13. By contrast, each time the Court discussed the distinction, it made clear that the structural interest, unlike the individual right, is not subject to waiver. Id. at 1942-43, 1943-44, 1945 n. 10. The Court explained that it could “not rely on Sharif s consent to ‘cure’ ” an “actual” separation-of-powers violation, but simply treated his consent as relevant to the merits question of whether “such violation has occurred” in the first place. Id. at 1945 n. 10 (alteration omitted).
Our dissenting colleague also misinterprets Sharif to suggest that structural Article III claims can be forfeited. See Dis. Op. 35-36. Having decided the structural question de novo, the Court remanded two questions: Whether Sharif had in fact consented to adjudication by the bankruptcy court, and if so, whether he had forfeited his right to adjudication by an Article III judge by failing to raise an Article III objection in the district court. Sharif, 135 S.Ct. at 1941, 1948-49. The reference to forfeiture is unremarkable. If the Seventh Circuit on remand finds that Sharif consented, then all that is left for the Seventh Circuit to decide is Sharif s personal right claim, and it has always been clear that individual rights — even individual Article III rights — are subject to forfeiture. The Court resolved the structural issue de novo without regard to any possible forfeiture. Even the Justice who was certain that Sharif had forfeited his constitutional claim thought it proper to resolve the structural Article III issue de novo. See id. at 1949 (Alito, J., concurring in part and concurring in the judgment). Indeed, the Court tied its remand instruction to the contentions in the petitioners’ brief, see id. at 1948-49, which acknowledged there are some Article III claims that “raise ‘structural’ concerns that litigants may not waive or forfeit.” Br. for Pet’rs Wellness Int’l, et al. 52.
Our analysis would not change even if, as the dissent maintains, the Court in Schor had instructed that courts should excuse waivers of Article III structural claims, instead of holding that such claims were unwaivable. See Dis. Op. 33-34, 37. The Article III challenge in Bahlul’s case goes to the heart of the judiciary’s status as a coordinate branch of government. Our colleague’s focus on the fact that Bah-lul is “concededly — and unapologetically— guilty of the charged offenses,” id. at 40, is a red herring. To excuse forfeiture would not be for the purpose of protecting an individual defendant, but to “safeguard!] the role of the Judicial Branch in our tripartite system.” Schor, 478 U.S. at 850, 106 S.Ct. 3245. The court would vindicate “the federal judiciary’s strong interests],” Kuretski, 755 F.3d at 937 (emphasis added), not merely Bahlul’s. Any disruption to normal appellate process, see Dis. Op. 37-39, 39 n. 8, is “plainly insufficient to overcome the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers” under Article III. Glidden Co. v. Zdanok, 370 U.S. 530, 536, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). To the extent the dissent insists that this court lacks the power to excuse forfeiture, see Dis. Op. 37-38; contra Nguyen v. United States, 539 U.S. 69, 80, 123 S.Ct. 2130, 156 L.Ed.2d 64 (2003), it relies on precedent applying Federal Rule of Criminal Procedure 52(b), which “governs on appeal from criminal proceedings ... in district court,” Olano, 507 U.S. at 731, 113 S.Ct. 1770; •see Fed. R.Crim.P. 1 Advisory Comm. Note (“[T]hese rules are intended to govern proceedings in criminal cases triable in the United States District Court.”), whereas Bahlul is appealing the decision of the Court of Military Commission Review, and *7 the statute governing such appeals, see 10 U.S.C. § 950g, contains none of the limitations the dissent labors to establish. The United States Court of Appeals for the Armed Forces has rejected the same argument in the court-martial context, affirming the decision of a lower tribunal to excuse forfeiture and conducting its own review de novo. See United States v. Quiroz, 55 M.J. 334, 338 (C.A.A.F.2001); 10 U.S.C. § 950f(d).
We turn to the merits of Bahlul’s structural Article III challenge to his conspiracy conviction.
II.
“Article III, § 1, of the Constitution mandates that ‘[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.’ ” Stem, 131 S.Ct. at 2608. Section 2, clause 1, provides that “[t]he judicial Power shall extend” to, among others, “all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority” and “to Controversies to which the United States shall be a Party.” These cases and controversies include criminal prosecutions. See United States ex rel. Toth v. Quarles, 350 U.S. 11, 15, 76 S.Ct. 1, 100 L.Ed.8 (1955); Ex parte Milligan, 71 U.S. (4 Wall.) 2, 121, 18 L.Ed. 281 (1866). Article III § 2 requires that “[t]he Trial of all Crimes, except in Cases of Impeachment, shall be by Jury.” U.S. Const, art. Ill, § 2, cl. 3. The Supreme Court, based on the text of Article III and its own precedent, has continued to reaffirm that
Article III is an inseparable element of the constitutional system of checks and balances that both defines the power and protects the independence of the Judicial Branch. Under the basic concept of separation of powers that flows from the scheme of a tripartite government adopted in the Constitution, the “judicial Power of the United States” can no more be shared with another branch than the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto.
Stem, 131 S.Ct. at 2608 (alterations and some internal quotation marks omitted) (quoting U.S. Const, art. Ill, § 1).
If a suit falls within the judicial power, then “the responsibility for deciding that suit rests with Article III judges in Article III courts.” Id. at 2609. There are limited exceptions: Congress may create non-Artiele III courts to try eases in the District of Columbia and U.S. territories not within a state. See Palmore v. United States, 411 U.S. 389, 390-91, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); American Ins. Co. v. 356 Bales of Cotton, 26 U.S. (1 Pet.) 511, 546, 7 L.Ed. 242 (1828). It may assign certain criminal prosecutions to courts martial, see Dynes v. Hoover, 61 U.S. (20 How.) 65, 79, 15 L.Ed. 838 (1857), and military commissions, see Ex parte Quirin, 317 U.S. 1, 46, 63 S.Ct. 2, 87 L.Ed. 3 (1942). And it may assign to administrative agencies the adjudication of disputes involving “public rights” stemming from federal regulatory programs. See Stern, 131 S.Ct. at 2610; Murray’s Lessee v. Hoboken Land & Improvement Co., 59 U.S. (18 How.) 272, 284, 15 L.Ed. 372 (1855). There are three types of military commissions. See, e.g., Hamdan, 548 U.S. at 595-98, 126 S.Ct. 2749 (plurality op.), 683, 126 S.Ct. 2749 (Thomas, J., dissenting). Bahlul was tried by a law of war military commission, Bahlul, 767 F.3d at 7, so the question is whether conspiracy falls *8 within the Article III exception for that type of commission,
A.
The Supreme Court addressed the contours of the exception to Article HI for law of war military commissions in the seminal case of Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 2; 87 L.Ed. 3 (1942). There, Nazi soldiers found out of uniform in the United States during World War II were convicted of sabotage and other offenses by a law of war military commission. They challenged their convictions on the ground that Article III guaranteed them a right to trial by jury in civil court. The Supreme Court held that the law of war military commission had jurisdiction to try “offense[s] against the law of war,” of which sabotage was one. Id. at 46, 63 S.Ct. 2. The Court explained that AÍrticle III § 2 was intended
to preserve unimpaired trial by jury in all those cases in which it had been recognized by the common law and in all cases of a like nature as they might arise in the future, but not to bring within the sweep of the guaranty those cases in which it was then well understood that a jury trial could not be demanded as of right.
Id. at 39, 63 S.Ct. 2 (citation omitted). Given this “long-continued and consistent interpretation,” the Court stated “that § 2 of Article III and the Fifth and Sixth Amendments cannot be taken to have extended the right to demand a jury to trials by military commission, or to have required that offenses against the law of war not triable by jury at common law be tried only in the civil courts.” Id. at 40, 63 S.Ct. 2. “[S]ince the founding of our government” and continued in the Articles of War, Article III has been construed “as not foreclosing trial by military tribunals, without a jury, of offenses against the law of war committed by enemies not in or associated with our Armed Forces.” Id. at 41, 63 S.Ct. 2.
In Quirin, the Supreme Court described the law of war as a “branch of international, law,” 317 U.S. at 29, 63 S.Ct. 2, and defined “the law of war as including that part of the law of nations which prescribes, for the- conduct of war, the status, rights and duties of enemy nations as well as of enemy individuals.” Id. at 27-28, 63 S.Ct. 2. The Court stated that Congress had exercised its authority to define and punish offenses against the law of nations by sanctioning ... the jurisdiction of military commissions to try persons for offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals.
Id. at 28, 63 S.Ct. 2. In addition to international precedents, see id. at 30 n. 7, 31 n. 8, 35 n. 12, 63 S.Ct. 2, the Court also considered domestic precedents (during the American Revolution, the War of 1812, and the Mexican and Civil Wars, see id. at 31 nn. 9 & 10, 42 n. 14, 63 S.Ct. 2), but only as potential limits on the law of war. The Court explained:
We may assume that there are acts regarded in other countries, or by some writers on international law, as offenses against the law of war which would not be triable by military tribunal here, either because they are not recognized by our courts as violations of the law of war or because they are of that class of offénses constitutionally triable only by a jury.
Id. at 29, 63 S.Ct. 2 (citing, as an example of the latter, Ex parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866)). Thus, “our courts” may recognize fewer law of war offenses than other countries’ courts, whether because they disagree about the content of international law or because of independent constitutional limitations. In *9 the same vein, the Supreme Court recognized that Congress had “adopt[ed] the system of common law applied by military tribunals so far as it should be recognized and .deemed applicable by the courts.” Id. at 30, 68 S.Ct. 2. The Court in Hamdan likewise treated “the American common law of war” as a source of constraint, not expansion. 548 U.S. at 613, 126 S.Ct. 2749.
The Supreme Court has adhered to Quinn ’s understanding of the meaning of the “law of war” for over seventy years. In Application of Yamashita, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946), the Court reaffirmed Quirin’s “governing principles,” id. at 9, 66 S.Ct. 340, and its statement that Congress had exercised its power to “define and punish Offenses against the Law of Nations, of which the law of war is a part,” id. at 7, 66 S.Ct. 340 (alterations omitted) (citing U.S. CONST. art. I, § 8, cl. 10). The Court held that the offenses there, stemming from the commanding general’s breach of duty to protect civilian populations and prisoners of war against atrocities committed by troops under his command, were “recognized in international law as violations of the law of war.” Id. at 14, 66 S.Ct. 340. To determine the content of the law of war, the Court looked to international sources, id. at 14-16, 66 S.Ct. 340, and it concluded that those sources alone “plainly imposed on petitioner ... an affirmative duty” that he had violated. Id. at 16, 66 S.Ct. 340. Having established that the charged offenses were violations of the international law of war, the Court mentioned two domestic field orders, but only to confirm domestic recognition of the duty imposed by the Hague and Geneva Conventions. See id. at 16 & n. 3, 66 S.Ct. 340. Again, in Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), the Supreme Court looked only to international law sources to determine whether the charged offense, “[b]reach of the terms of an act of surrender,” was a “war crime.” Id. at 787-88 & n. 13, 70 S.Ct. 936. More recently, in Hamdan, the Supreme Court reaffirmed Quirin’s principle that the “law of war” means “the body of international law governing armed conflict.” 548 U.S. at 641, 126 S.Ct. 2749 (Kennedy, J., concurring in part); id. at 603, 126 S.Ct. 2749 (plurality op.) (quoting Quirin, 317 U.S. at 30, 35-36, 63 S.Ct. 2).
The Supreme Court’s reason in Quirin for recognizing an exception to Article III — that international law of war offenses did not entail a right to trial by jury at common law, 317 U.S. at 40-41, 63 S.Ct. 2 — does not apply to conspiracy as a standalone offense. The Court in Quirin held that the international law of war offense of unlawful belligerency was triable by law of war military commissions. 317 U.S. at 36, 46, 63 S.Ct. 2. Although the Court had no occasion to speak more broadly about whether other offenses came within the Article III exception, its reasoning precludes an Article III exception for conspiracy, which did entail a right to trial by jury at common law. In Callan v. Wilson, 127 U.S. 540, 8 S.Ct. 1301, 32 L.Ed. 223 (1888), cited in Quirin, 317 U.S. at 39, 63 S.Ct. 2, the Court pointed to authorities “sufficient to show” that “the nature of the crime of conspiracy at common law ... [was] an offense of a grave character, affecting the public at large,” such that a person so charged could not be tried without a jury, see Callan, 127 U.S. at 556, 8 S.Ct. 1301. The reasoning in Quirin also counsels against expanding the exception beyond international law of war offenses. Stating that “[f]rom the very beginning of its history th[e] Court has recognized and applied the law of war as [being] part of the law of nations,” Quirin, 317 U.S. at 27, 63 S.Ct. 2, the Court explained that some offenses may not be triable by military *10 commission because “they are not recognized by our courts as violations of the law of war,” id. at 29, 63 S.Ct. 2. No subsequent Supreme Court holding suggests that law of war military commissions may exercise jurisdiction over offenses not recognized by the “law of war” as defined in Quiñn.
B.
The parties agree that Bahlul was tried by a law of war military commission that had jurisdiction to try charges for offenses against the law of war as defined in Quiñn. The government concedes that conspiracy is not a violation of the international law of war. See U.S. Appellee’s Br. to the En Banc Court at 34 (July 10, 2013). The question, therefore, is whether a law of war military commission may try domestic offenses — specifically conspiracy— without intruding on the judicial power in Article III.
The government insists that the Article III exception identified in Quiñn is not limited to international law of war offenses because “the sabotage offense at issue in Quiñn — which the Court viewed as akin to spying — is not and has never been an offense under the international law of war.” Appellee’s Br. 54. • Yet the Supreme Court in Quiñn concluded otherwise. It looked to “authorities on International Law” who “regarded as war criminals” saboteurs who passed behind enemy lines without uniform. 317 U.S. at 35 & n. 12, 63 S.Ct. 2. It relied on international sources to establish that the offense was recognized “[b]y universal agreement and practice.” Id. at 30 & n. 7, 31 n. 8, 35 n. 12, 63 S.Ct. 2. And it quoted language from early statutes and military tribunal proceedings where spying was identified as punishable by military tribunal under the “law and usage of nations.” Id. at 31 n. 9, 41, 63 S.Ct. 2. The government points to scholarly criticism of the Court’s conclusion, see Appellee’s Br. 32, but this court is bound by the Supreme Court’s analysis in Quiñn, which was premised on sabotage being an international offense. See Quiñn, 317 U.S. at 35-36, 63 S.Ct. 2.
Alternatively, the government maintains that even if Quiñn did not extend the Article III exception to domestic offenses, historical practice demonstrates that it has been so extended. See Appellee’s Br. 20, 31-39. The Supreme Court, however, when relying on historical practice to analyze the separation of powers, has required much more evidence of a settled tradition than the government has identified. For instance, in Myers v. United States, 272 U.S. 52, 175, 47 S.Ct. 21, 71 L.Ed. 160 (1926), the Court held, upon reviewing more than seven decades in which Presidents had continuously removed Executive Branch officers without congressional involvement, that Congress lacked authority to restrict the President’s removal power. In United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), the Court rejected, in view of an “unbroken legislative practice which has prevailed almost from the inception of the national government to the present day,” the argument that a joint resolution of Congress authorizing the President to determine whether to embargo the sale of arms and munitions to belligerents in a foreign war was an unlawful delegation of legislative power. Id. at 322, 57 S.Ct. 216. Recently, in National Labor Relations Board v. Noel Canning, — U.S. -, 134 S.Ct. 2550, 189 L.Ed.2d 538 (2014), the Court defined the scope of the President’s authority under the Recess Appointments Clause, U.S. Const. art. II, § 2, cl. 3, based on a lengthy and dense historical practice. Upon identifying “thousands of intra-session recess appointments” and noting that “Presidents since Madison *11 have made many recess appointments filling vacancies that initially occurred prior to a recess,” id. at 2562, 2571, the Court concluded that the Clause authorized those types of appointments. By contrast, where the Court found only a handful of instances in which a President had made a recess appointment during an inter-session recess lasting less than ten days, the Court held that those recesses were “presumptively too short to fall within the Clause.” Id. at 2567.
The history on which the government relies fails to establish a settled practice of trying non-international offenses in law of war military commissions. The longstanding statutes conferring military jurisdiction over charges of spying and aiding the enemy do not, as the government maintains, demonstrate that domestic offenses come within the Article III exception. The Congresses that enacted those statutes viewed those offenses as punishable under the international law of war. The 1806 statute “imposed the death penalty on alien spies ‘according to the law and usage of nations, by sentence of a general court martial.’ ” Quiñn, 317 U.S. at 41, 63 S.Ct. 2 (quoting Act of Congress of Apr. 10, 1806, 2 Stat. 371). A 1776 Resolution adopted by the Continental Congress contained a nearly identical provision. Id. at 41 & n. 13, 63 S.Ct. 2 (citing Edmund M. Morgan, Court-Martial Jurisdiction over Non-Military Persons Under the Articles of War, 4 Minn. L.Rev. 79, 107-09 (1920) (quoting Resolution of Aug. 21, 1776, 1 JouRnals of CongRess 450)). In 1865, the Attorney General of the United States, James Speed, concluded in a formal opinion that “to act as spy is an offence against the laws of war,” and that “every lawyer knows that a spy was a well-known offender under the laws of war.” Military Commissions, 11 Op. Att’y Gen. 297, 312, 313 (1865). The oft-cited William Winthrop, the “Blackstone of Military Law,” Ham-dan, 548 U.S. at 597, 126 S.Ct. 2749 (plurality op.) (quoting Reid, 354 U.S. at 19 n. 38, 77 S.Ct. 1222 (plurality op.)), reached the same conclusion. See W. Winthrop, Military Law and Preoedents 769-70 (2d ed.1920). Even authority relied upon by the government indicates that during the early Republic spies were considered “war criminals.” See Appellee’s Br. 31-32 (quoting 2 L. Oppenheim, International Law 287 (4th ed.1926)).
But even if spying and aiding the enemy were not international offenses, their historical pedigrees stand in marked contrast to that of conspiracy. Both of those offenses have been subject to military jurisdiction since the ratification of the Constitution. See Quirin, 317 U.S. at 41, 63 S.Ct. 2; Act of Apr. 10, 1806, 2 Stat. 359, 371. Congress has reenacted the spying and aiding the enemy statutes on multiple occasions, see, e.g., Act of June 4, 1920, Pub.L. No. 66-242, 41 Stat. 759, 804; Act of Aug. 29, 1916, Pub.L. No. 64-242, 39 Stat. 619, 663; Act of Mar. 3,1863,12 Stat. 731, 737, and scores of law of war military tribunals have tried the offenses, see Qui-rin, 317 U.S. at 42 n. 14, 63 S.Ct. 2. When analyzing separation-of-powers challenges, the Supreme Court has explained, “the practical construction of the [Cjonstitution, as given by so many acts of [Cjongress, and embracing almost the entire period of our national existence, should not be overruled, unless upon a conviction that such legislation was clearly incompatible with the supreme law of the land.” Marshall Field & Co. v. Clark, 143 U.S. 649, 691, 12 S.Ct. 495, 36 L.Ed. 294 (1892); see Mistretta v. United States, 488 U.S. 361, 401, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989); Stuart v. Laird, 5 U.S. (1 Cranch) 299, 309, 2 L.Ed. 115 (1803).
The history of inchoate conspiracy being tried by law of war military tribunals is thin by comparison and equivocal at best. *12 The- government has identified only a handful of ambiguous examples, and none in which an inchoate conspiracy conviction was affirmed by the Judicial Branch. The examples are unpersuasive in themselves and insufficient to establish a longstanding historical practice.
First, although the charges against the 'Lincoln assassins referred to conspiracy, the specifications listed the elements of the completed offense. See J. Holt & T. Ewing, CHARGE AND SPECIFICATION AGAINST David E. HeRold, et al. 3 (1865) (Petr.’s. Supp. App’x 77-78); see also Hamdan, 548 U.S. at 604 n. 35, 126 S.Ct. 2749 (plurality op.); id. at 609, 126 S.Ct. 2749. The Attorney General’s formal opinion in 1865 described the charge as “the offence of having assassinated the President.” 11 Op. Att’y Gen. at 297; see id. at 316-17. At the time, it was unclear that conspiracy could even be charged separately from the object offense, once completed. See Iannelli v. United States, 420 U.S. 770, 781 & n. 13, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975) (citing Hampton L. Carson, The Law of Criminal Conspiracies and Agreements as Found in the American Cases, in R. Wright, The Law of CRIMINAL Conspiracies AND Agreements 191 (1887)). When Congress first enacted a conspiracy statute in 1867, the offense carried only a two-year penalty. See Act of Mar. 2, 1867, 14 Stat. 471, 484.
Because of conspiracy’s uncertain legal status at the time, the dissent’s theory that “[t]he circumstances surrounding the Lincoln assassination” indicate that “the criminal defendants could only have been charged with conspiracy,” Dis. Op. 60 (emphasis in original), is mere speculation, especially in view of the contrary contemporary analysis by the Attorney General. See 11 Op. Att’y Gen. at 297, 316-17. Moreover, Winthrop noted that the Lincoln assassins’ tribunal was a mixed martial law and law of war military commission. See W. Winthrop, Military Law and Precedents, at 839 & n. 5; cf. id. at 842. The dissent appears to disagree with Winthrop (on whom it otherwise relies, see Dis. Op. 55, 58-59, 62) regarding the jurisdictional basis for the assassins’ tribunal. Compare id. at 60-61, with W. Winthrop, Military Law and Precedents, at 839 & n. 5. The dissent further ignores Winthrop’s explanation that conspiracy was a “civil crime” or “crime against society” and not a law of war offense. W. Winthrop, Military Law and Precedents, at 842. Where Winthrop listed the law of war violations that had “principally” been charged in U.S. military commissions, conspiracy was not among them. See id. at 839-40. In' response, the dissent cites Milligan, 71 U.S. at 127, for the proposition that military tribunals cannot exercise martial law jurisdiction unless the civil courts are closed,' see Dis. Op. 60-61, even though Milligan was decided after the Lincoln assassins’ prosecution. The unreported district court opinion in Ex parte Mudd, 17 F. Cas. 954 (1868), hardly strengthens the dissent’s position, see Dis. Op. 60-61 n. 21; the district court described the offense as “assassination” and only used “conspiracy” in the same terms as the charging document, while distinguishing Milligan based on the state of war in the Capital, not based on the nature of the offense. Mudd, 17 F. Cas. at 954.
Second, although the charges against the Nazi saboteurs in Quirin included conspiracy to commit the charged offenses, the Court upheld the jurisdiction of the law of war military commission only as to the charge of sabotage and did not mention the conspiracy charge in its analysis. See Quirin, 317 U.S.' at 46, 63 S.Ct. 2. Similarly, although William Colepaugh was convicted of sabotage and spying, in addition to conspiracy to commit those offenses, the U.S. Court of Appeals for the *13 Tenth Circuit affirmed the jurisdiction of the military tribunal in view of the law of war acts of belligerency without addressing the conspiracy charge. See Colepaugh v. Looney, 235 F.2d 429, 431-32 (10th Cir.1956). Moreover, in both Quirin and Cole-paugh, the charged conspiracies involved completed offenses. By contrast, none of the underlying overt acts for Bahlul’s conspiracy conviction was a law of war offense itself, and the government declined to charge him with vicarious liability under Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), or with joint criminal enterprise, see Bahlul, 767 F.3d at 38-39 (Rogers, J., concurring in the judgment in part and dissenting) (citing U.S. Appellee’s Br. to the En Banc Court at 47 (Jul. 10, 2013)).
Third, the government asserts that “during the Civil War, defendants were regularly convicted of conspiracies that were charged as unconsummated offenses,” Appellee’s Br. 37, but it cites only a single instance. Col. George St. Leger Grenfel was convicted by a military tribunal of conspiracy to free prisoners of war in Chicago and to destroy that city. See GeneRal Court-Martial Orders No. 452 (Aug. 22, 1865). As Bahlul points out, however, Grenfel’s commission, like that of the Lincoln assassins, was a “hybrid” commission exercising jurisdiction based in part on the President’s declaration of martial law. See Reply Br. 18 (citing Hamdan, 548 U.S. at 609 n. 37, 126 S.Ct. 2749 (plurality op.); W. Winthrop, Military Law and Precedents, at 839 n. 5); S. Starr, Colonel Grenfell’s Wars: The Life of a Soldier of Fortune, 5, 219 (1971) (cited in Appellee’s Br. 37). In defending the Gren-fel commission’s jurisdiction, the prosecution relied on the fact that “martial law obtained throughout the United States and the Territories during the continuance of the [Civil] [W]ar.” Judge Advocate’s Reply, Courtroom, Cincinnati, Ohio, Jan. 17, 1865, United States v. Walsh, et al., reprinted in H. Exec. Doc. No. 50, 39th Cong., 2d Sess., at 20. The Grenfel commission, like the Lincoln assassins’ commission, “is at best an equivocal” case. Hamdan, 548 U.S. at 604 n. 35, 126 S.Ct. 2749 (plurality op.).
The historical examples identified by the government thus fall far short of what the Supreme Court has required when using historical practice to interpret the constitutional separation of powers. Our dissenting colleague adds only the orders of General MacArthur and General Wedemeyer from the end of World War II and the Korean Conflict. See Dis. Op. 62 & nn. 22-23. But the en banc court dismissed the persuasive force of such military orders for lack of high-level Executive Branch consultation. See Bahlul, 767 F.3d at 25 n. 16. And during the Korean Conflict there apparently were no trials conducted by United Nations Military Commissions. See Jordan J. Paust et al., International Criminal Law: Cases and Materials 724 (1996).
Finally, the government asserts that any “enemy belligerent” can be tried by a military commission regardless of the offense. Appellee’s Br. 56. But the Supreme Court has focused on “the question whether it is within the constitutional power of the national government to place petitioners upon trial before a military commission for the offenses with which they are charged.” Quirin, 317 U.S. at 29, 63 S.Ct. 2 (emphasis added). Thus, in Quirin, the Court “assume[d] that there are acts ” that could not be tried by military commission “because they are of that class of offenses constitutionally triable only by a jury.” Id. (emphasis added). Likewise, in Yama-shita, the Court “considered] ... only the lawful power of the commission to try the petitioner for the offense charged.” 327 U.S. at 8, 66 S.Ct. 340 (emphasis added). In Hamdan, the Court explained that the status of the offender (being a member of *14 a foreign armed force) and the nature of the offense were both necessary conditions for the exercise of jurisdiction by a law of war military commission. See Hamdan, 548 U.S. at 597-98, 126 S.Ct. 2749 (plurality op.) (citing W. Winthrop, MilitaRY Law and PRECEDENTS, at 836-39); accord id. at 2826 (Thomas, J., dissenting).
C.
This court need not decide the precise relationship between Bahlul’s Article I and Article III challenges. In Quirin, the Supreme Court’s Article III analysis did not look to Article I at all. See Quirin, 317 U.S. at 38-46, 63 S.Ct. 2. In some contexts, however, Article III exceptions have turned on the extent of congressional power. See Palmore v. United States, 411 U.S. 389, 402-04, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 236-38, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960). Upon examining the government’s Article I contentions, we conclude that they do not call into question the conclusion that the Article III exception for law of war military commissions does not extend to the trial of domestic crimes in general, or inchoate conspiracy in particular.
1. The government maintains that the war powers in Article I vest Congress with broad authority to subject war-related offenses to the jurisdiction of military commissions. See Appellee’s Br. 27-30. The war powers include the power to “define and punish ... Offences against the Law of Nations,” U.S. Const, art. I, § 8, cl. 10, “declare War,” id. § 8, cl. 11, “raise and support Armies,” id. § 8, cl. 12, “provide and maintain a Navy,” id. § 8, cl. 13, “make Rules for the Government and Regulation of the land and naval Forces,” id. § 8, cl. 14, “provide for calling forth the Militia,” id. § 8, cl. 15, and to “make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers,” id. § 8, cl. 18. Because the war powers contain no textual limitation based on international law, the government concludes there is no such restriction on military commission jurisdiction. See Appel-lee’s Br. 29-30. In the government’s view, the war powers support military jurisdiction oyer any offense “committed by an enemy belligerent during and in relation to an armed conflict with the United States [that] ... has a palpable effect on the nature of that conflict.” Oral Arg. Tr. 49.
The Supreme Court has looked to the Define and Punish Clause in determining whether Congress may designate particular offenses within the jurisdiction of a law of war military commission. The Court in Quirin, Yamashita, and Hamdan did look to the war powers in discussing congressional authority to establish military commissions. See Hamdan, 548 U.S. at 591, 126 S.Ct. 2749 (plurality op.); Yamashita, 327 U.S. at 12, 66 S.Ct. 340; Quirin, 317 U.S. at 26, 63 S.Ct. 2; see also W. Winthrop, Military Law and Preoedents, at 831 (stating that Congress’s power “to ‘declare war’ and ‘raise armies’ ” provided the “original sanction” for military commissions). But in addressing Congress’s authority to confer jurisdiction over particular offenses, the Court has consistently looked to the Define and Punish Clause alone. See Hamdan, 548 U.S. at 601-20, 126 S.Ct. 2749 (plurality op.); Yamashita, 327 U.S. at 7, 66 S.Ct. 340; id. at 26, 66 S.Ct. 340 (Murphy, J., dissenting); Quirin, 317 U.S. at 28, 63 S.Ct. 2. In Yamashita, the Court emphasized the distinction, explaining that “the [military] commission derives its existence ” from the war powers, 327 U.S. at 12, 66 S.Ct. 340 (emphasis added), but that its jurisdiction over specific offenses comes from Congress’s “exercise of the power conferred upon it by Article I, § 8, Cl. 10 of the Constitution to *15 ‘define and punish * * * Offenses against the Law of Nations * * *,’ of which the law of war is a part.” Id. at 7, 66 S.Ct. 340. Winthrop endorsed this distinction in stating that Civil War-era legislation subjecting “spies and guerillas” to military jurisdiction “may be regarded as deriving its authority from” the Define and Punish Clause. W. Winthrop, Militaey Law and PRECEDENTS, at 831.
In applying the Define and Punish Clause, the Supreme Court long ago cautioned that “[wjhether the offense as defined is an offense against the law of nations depends on the thing done, not on any declaration to that effect by [C]ongress.” United States v. Arjona, 120 U.S. 479, 488, 7 S.Ct. 628, 30 L.Ed. 728 (1887). As noted, the government has conceded that conspiracy is not an international war crime. Notwithstanding the atrocities at issue, the International Military Tribunal at Nuremberg considered and rejected conspiracy to commit war crimes as an international law of war offense. See 22 TRIAL OF THE MAJOR WAR CRIMINALS BEFORE the International Military Tribunal: Nuremberg, 14 November 1945-1 October 1946, at 469 (1948). Conspiracy to commit war crimes is included neither in the major treaties on the law of war,[1] nor in the jurisdiction of modern war crimes tribunals.[2] Congress cannot, pursuant to the Define and Punish Clause, declare ah offense to be an international war crime when the international law of war con-cededly does not. See United States v. Furlong, 18 U.S. (5 Wheat.) 184, 198, 5 L.Ed. 64 (1820). The exceptions—conspiracy to commit genocide and common plan to wage aggressive war, see Harridan, 548 U.S. at 610, 126 S.Ct. 2749 (plurality op.)— are not at issue here, for Bahlul was charged with neither. In light of the international community’s explicit and re *16 peated rejection of conspiracy as a law of war offense, we are puzzled by our dissenting colleague’s statement that “[t]he international community does recognize that Bahlul violated the principles of the law of nations,” Dis. Op. 43 (internal quotation marks and italics omitted), and by its reference to “the international community’s agreement that those who conspire to commit, war crimes can be punished as war criminals,” id. at 55. There is no such “agreement.” The dissent offers nothing to support this claim.
Our dissenting colleague also maintains that this court must accord Congress “ ‘extraordinary deference when it acts under its Define and Punish Clause powers.’ ” Dis. Op. 45 (quoting Bahlul, 767 F.3d at 59 (Brown, J., concurring in the judgment in part and dissenting in part)). This court has no occasion to decide the extent of that deference because the government has never maintained that Congress defined conspiracy in the 2006 MCA as a violation of the law of nations. The legislative history of the 2006 MCA is not to the contrary. See id. at 51 n. 17. In maintaining otherwise, the dissent confuses acting pursuant to the Defíne and Punish Clause with identifying the content of the law of nations, see id. at 50-52; Congress purported to do the former, not the latter. In Bahlul’s case, the “law of nations” is not “too vague and deficient to be a rule,” id. at 44 (quotation marks omitted); to the contrary, it quite clearly does not view conspiracy to be an independent war crime, as the government has conceded.
To the extent our colleague would interpret the Define and Punish Clause to confer open-ended congressional authority to create new war crimes, see Dis. Op. 47-50, the Supreme Court has rejected such an approach. In Furlong, 18 U.S. (5 Wheat.) 184, the Court explained with regard to piracy, the other object of the Define and Punish Clause: “If by calling murder piracy, [Congress] might assert a jurisdiction over that offence committed by a foreigner in a foreign vessel, what offence might not be brought within their power by the same device?” Id. at 198 (emphasis in original). The same reasoning applies to “Offenses against the Law of Nations,” the other object of the Define and Punish Clause. U.S. Const, art. I, § 8, cl. 10. Congress Can neither define as piracy a crime that is clearly not piracy, nor define as a law of nations offense a crime that is avowedly not a law of nation's offense. In other contexts as well, the Supreme Court has rejected the limitless form of congressional power the dissent proposes. Cf. City of Boerne v. Flores, 521 U.S. 507, 529, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Contrary to our dissenting colleague, international law itself affords no limit because it does not purport to identify which non-international offenses can and cannot be treated as domestic war crimes; the dissent points to no offenses whose trial by military commission are “inconsistent with” or not “permitted]” by international law. Dis. Op. 55, 47 (italics omitted). In urging such a limitation, however, the dissent does reveal one shared premise: that the content of international law constrains congressional authority under the Define and Punish Clause. According to the dissent, congressional action under the Clause must be “consistent with international law,” id. at 52, such that Congress may only “track somewhat ahead of the international community,” id. at 50 (emphasis added). Thus, despite some rhetorical protestations to the contrary, see id. at 27-28, 49, 65-66, the dissent’s disagreement is not about whether international law constrains congressional authority, only to what extent.
The dissent’s reliance on Yamashita as support for its understanding of the Define *17 and Punish Clause, see Dis. Op. 45-47, is misplaced. In Yamashita, the Supreme Court did not address the nature of Define and Punish Clause authority at all, because Congress had not defined any specific offenses. See Yamashita, 327 U.S. at 7, 66 S.Ct. 340. The Court therefore had to undertake its own analysis of international law, and it concluded that the Hague and Geneva Conventions “plainly imposed on petitioner” a duty that he had violated. Id. at 16, 66 S.Ct. 340. It is therefore difficult to understand how Yamashita affects the type of deference owed to Congress one way or the other.
2. Nor does the Necessary and Proper Clause allow Congress to do what its express powers do not. See Toth, 350 U.S. at 21-22, 76 S.Ct. 1. The government maintains that even if Congress’s authority arose only under the Define and Punish Clause, “Congress is not restricted under that Clause only to criminal offenses that are violations of international law.” Ap-pellee’s Br. 43. “Rather, Congress may, under the Necessary and Proper Clause, proscribe conspiracy to commit war crimes, such as terrorist attacks against civilians, that are themselves violations of the law of nations as a necessary and proper implementation of its power and responsibility to prevent and punish such violations.” Id. The Supreme Court has adopted a different view.
In Toth, 350 U.S. at 22, 76 S.Ct. 1, the Supreme Court explained that it was “not willing to hold that power to circumvent [jury] safeguards should be inferred through the Necessary and Proper Clause.” It described the “great difference between trial by jury and trial by selected members of the military forces,” id. at 17, 76 S.Ct. 1, and explained that “[t]here are dangers lurking in military trials which were sought to be avoided by the Bill of Rights and Article III of our Constitution,” id. at 22, 76 S.Ct. 1. In Singleton, the Court rejected expansion of military jurisdiction through the Necessary arid Proper Clause because “[t]his Court cannot diminish and expand that power, either on a case-by-case basis or on a balancing of the power there granted Congress against the safeguards of Article III and the Fifth and Sixth Amendments.” 361 U.S. at 246, 80 S.Ct. 297. The Court explained: “If the exercise of the power is valid it is because it is granted in Clause 14 [the Make Rules Clause], not because of the Necessary and Proper Clause.” Id. at 247, 80 S.Ct. 297. “We are therefore constrained to say that since this Court has said that the Necessary and Proper Clause cannot expand Clause 14 so as to include prosecution of civilian dependents for capital crimes, it cannot expand Clause 14 to include prosecution of them for noncapital offenses.” Id. at 248, 80 S.Ct. 297. As the plurality in Reid emphasized, “the jurisdiction of military tribunals is a very limited and extraordinary jurisdiction derived from the cryptic language in Art. I, § 8, and, at most, was intended to be only a narrow exception to the normal and preferred method of trial in courts of law.” 354 U.S. at 21, 77 S.Ct. 1222; see Hamdan, 548 U.S. at 590, 126 S.Ct. 2749 (plurality op.). Consequently, “the Necessary and Proper Clause cannot operate to extend military jurisdiction to any group of persons beyond that class described in” an enumerated Article I power. Reid, 354 U.S. at 20-21, 77 S.Ct. 1222 (plurality op.). “Under the grand design of the Constitution civilian courts are the normal repositories of power to try persons charged with crimes against the United States.” Id. at 21, 77 S.Ct. 1222.
The government’s response is that Congress may enact legislation “necessary to comply with our nation’s international responsibilities.” Appellee’s Br. 45. In Ar- *18 jona, 120 U.S. at 484, 7 S.Ct. 628, the Supreme Court upheld a counterfeiting prohibition because “[t]he law of nations requires every national government ... to punish those who, within its own jurisdiction, counterfeit the money of another nation.” The Court observed that without the criminal statute, the United States would “be unable to perform a duty which they may owe to another nation, and which the law of nations has imposed on them as part of their international obligations.” Id. at 487, 7 S.Ct. 628. Here, the government points to the Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 75 U.N.T.S. 287, 6 U.S.T. 3516 (“Geneva IV”), which prohibits “[cjollective penalties and likewise all measures of intimidation or of terrorism.” Id. art. 33. The Convention requires signatories to “undertake to enact any legislation necessary to provide effective penal sanctions for persons committing, or ordering to be committed, any of the grave breaches of the present Convention,” id. art. 146, which include the “willful killing ... of a protected person,” id. art. 147, defined as “those who ... find themselves, in ease of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not nationals,” id. art. 4. Each signatory “shall take measures necessary for the suppression of all acts contrary to the provisions of the present Convention.” Id. art. 146.
Even if Congress has authority to criminalize non-international offenses pursuant to the Define and Punish Clause, as supplemented by the Necessary and Proper Clause, the. government fails to explain why such congressional power to prohibit conduct implies the power to establish military jurisdiction over that conduct. Military jurisdiction over the offenses that the Supreme Court has previously upheld under the Define and Punish Clause — such as spying and sabotage — have a textual basis in the Constitution: The “Law of Nations,” U.S. Const, art. I, § 8, cl. 10, itself makes those offenses “cognizable by [military] tribunals.” Quirin, 317 U.S. at 28, 63 S.Ct. 2; see id. at 41 & n. 13, 63 S.Ct. 2; Act of Apr. 10, 1806, 2 Stat. 359, 371; 11 Op. Att’y Gen. at 316; W. Winthrop, Militaey Law and PRECEDENTS, at 769. Court-martial jurisdiction similarly has a textual basis in the Constitution, which authorizes Congress to “make Rules for the Government and Regulation of the land and naval Forces,” U.S. Const, art. I, § 8, cl. 14, and exempts those offenses from trial by jury, see id. amend. V. The sabotage offense in Quirin was subject to military jurisdiction based on “a construction of the Constitution which has been followed since the founding of our government.” 317 U.S. at 41, 63 S.Ct. 2. Military jurisdiction over conspiracy, by contrast, has neither an express textual basis nor an established historical tradition.
The government maintains that under the Necessary and Proper Clause, “[i]f commission of the substantive crime that is the conspiracy’s object would be within the scope of permissible congressional regulation, then so is the conspiracy.” Appel-lee’s Br. 45. But again, Bahlul’s Article III challenge is not that Congress lacks authority to prohibit his conduct; rather, he challenges Congress’s authority to confer jurisdiction in a military tribunal. Absent a textual or historical basis for prosecuting conspiracy as a standalone offense in a law of war military commission, the government’s position is confounded by the Supreme Court’s repeated reluctance to extend military jurisdiction based on the Necessary and Proper Clause. See, e.g., Singleton, 361 U.S. at 246-48, 80 S.Ct. 297; Reid, 354 U.S. at 20-21, 77 S.Ct. 1222 (plurality op.); Toth, 350 U.S. at 21-22, 76 S.Ct. 1. The cases on which the govern *19 ment relies, such as Callanan v. United States, 364 U.S. 587, 593-94, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961), and United States v. Feola, 420 U.S. 671, 694, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), involve criminal conspiracy prosecutions in civil courts. See Appellee’s Br. 45-46 (also citing United States v. Price, 265 F.3d 1097, 1107 n. 2 (10th Cir.2001); United States v. Jannotti, 673 F.2d 578, 591-94 (3d Cir.1982)).
D.
Before concluding we address some further flaws in our dissenting colleague’s opinion.
First, the dissent relies on inapposite authorities regarding the source of congressional authority for law of war military commissions. Its citations refer to military commissions exercising jurisdiction far beyond the law of war. Thus, in Ex parte Milligan, 71 U.S. 2, 4 Wall. 2, 18 L.Ed. 281 (1866), the four Justices cited by the dissent, see Dis. Op. 56, were discussing courts martial and military commissions whose jurisdiction was based on military government and martial law. See Milligan, 71 U.S. at 141-42 (Chase, C.J., concurring in the result); see generally Hamdan, 548 U.S. at 595-98, 126 S.Ct. 2749 (plurality op.), 683, 126 S.Ct. 2749 (Thomas, J., dissenting); Bahlul, 767 F.3d at 7. The constitutional authority for those commissions, whose jurisdiction may include domestic crimes, see Hamdan, 548 U.S. at 595-96, 126 S.Ct. 2749 (plurality op.); Bahlul, 767 F.3d at 7, does not extend to law of war commissions. The dissent’s reliance on Madsen v. Kinsella, 343 U.S. 341, 72 S.Ct. 699, 96 L.Ed. 988 (1952); see Dis. Op. 56, 57-58, 59, is likewise misplaced; that case involved a military-government commission, not a law of war military commission. Madsen, 343 U.S. at 343-44, 345-48, 72 S.Ct. 699. And the dissent’s reliance on Winthrop’s statement that “in general, it is” the war powers “from which the military tribunal derives its original sanction,” Dis. Op. 58 (alterations omitted) (quoting W. Winthrop, Military Law and Preoedents, at 831), ignores both that Winthrop was discussing all three kinds of military commission, stating the commission’s “authority is thus the same as the authority for the making and waging of war and for the exercise of military government and martial law,” and that Winthrop looked exclusively to the Define and Punish Clause as the source of authority for law of war commissions to try spying and aiding the enemy, see W. Winthrop, Military Law and Precedents, at 831.
Second, the dissent maintains that if conspiracy does not fall within the Article III exception for law of war military commissions, then Bahlul’s conviction must be affirmed under Schor’s multi-factor balancing approach. See Dis. Op. 65-69. The Supreme Court has never suggested that an entire criminal adjudication outside an established Article III exception could ever satisfy the Schor analysis. The dissent cites Palmore to suggest otherwise, see id. at 65, but the Court conducted no balancing analysis in Palmore because the case involved a criminal adjudication within the established Article III exception for territorial courts. Palmore, 411 U.S. at 403, 93 S.Ct. 1670; see Northern Pipeline, 458 U.S. at 55 & n. 16, 102 S.Ct. 2858 (plurality op.). But even accepting the dissent’s premise, its analysis fails on its own terms. Bahlul’s military commission is on the wrong side of nearly every balancing factor that the Supreme Court has applied.
With respect to what the dissent characterizes as the “most important[]” factor, Dis. Op. 66, the 2006 MCA provides for appellate review “only with respect to matters of law, including the sufficiency of the *20 evidence to support the verdict,” 10 U.S..C. § 950g(d). Sufficiency review is “sharply limited,” Wright v. West, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992), and “very deferential[ ],” United States v. Harrison, 931 F.2d 65, 71 (D.C.Cir.1991). This is exactly the type of limited judicial review the Supreme Court has repeatedly held offends Article III. See Stern, 131 S.Ct. at 2611; Schor, 478 U.S. at 853, 106 S.Ct. 3245; Northern Pipeline, 458 U.S. at 85, 86 n. 39, 102 S.Ct. 2858 (plurality op.); id. at 91, 102 S.Ct. 2858 (Rehnquist, J., concurring in the judgment); Crowell v. Benson, 285 U.S. 22, 57, 52 S.Ct. 285, 76 L.Ed. 598 (1932). The dissent pretends, otherwise, glossing over the details of Schor and ignoring Stern and Northern Pipeline. See Dis. Op. 66-67. In Stem, the Supreme Court faulted the bankruptcy statute for providing judicial review “only under the usual limited appellate standards,” which “require[d] marked deference to, among other things, the [tribunal’s] findings of fact.” 131 S.Ct. at 2611. The Court reached the same conclusion in Northern Pipeline, 458 U.S. at 85, 86 n. 39, 102 S.Ct. 2858 (plurality op.); 102 S.Ct. 2858, id. at 91 (Rehnquist, J., concurring in the judgment). In Schor, the Court noted that “CFTC orders are [ ] reviewed under the same ‘weight of the evidence’ standard sustained in Crowell, rather than the more deferential [clearly erroneous] standard found lacking in Northern Pipeline.” 478 U.S. at 853, 106 S.Ct. 3245. The “sufficiency of the evidence”- standard in the 2006 MCA is more deferential than the “usual limited appellate standards” rejected in Stem and the “clearly erroneous” standard rejected in Northern Pipeline and Schor. Rather than addressing these holdings directly, the dissent relies on in-apposite precedent involving (1) “adjunct” fact-finders within Article III courts, see Dis. Op. 66-67 (citing Crowell, 285 U.S. at 51, 52 S.Ct. 285); see also Stem, 131 S.Ct. at 2619; Northern Pipeline, 458 U.S. at 78,102 S.Ct. 2858 (plurality op.), (2) factual review in appeals from state courts and Article III district courts, see Dis. Op. 66-67 (citing Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); The Francis Wright, 105 U.S. 381, 386, 26 L.Ed. 1100 (1881)), and (3) cases within the “public rights” exception to Article III, where there is no reason to apply a balancing analysis, see Dis. Op. 67 (citing Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946)). No Article III issue was raised or addressed in Estep or Jackson.' Thus, the dissent’s “most important]” factor — appellate review for legal error only, id. at 66 — is one the Supreme Court has expressly foreclosed.
In Sharif, where the Court upheld adjudication by bankruptcy courts outside the established Article III exception, the two necessary factors were the parties’ consent to the adjudication, and the fact that “Article III courts retained] supervisory authority over the process.” Sharif, 135 S.Ct. at 1944. Neither is true in Bahlul’s case. First, the Court in Sharif emphasized that litigant consent has been a crucial factor in its prior decisions on non-Article III adjudication: In Schor, the Court “[l]ean[ed]' heavily on the importance of Schor’s consent.” Sharif 135 S.Ct. at 1943; see id. at 1945 n. 10. Subsequent decisions by the Supreme Court involving the Federal Magistrates Act “reiterated the importance of consent to the constitutional analysis.” Id. at 1943. And in both Stem and Northern Pipeline, compliance with Article III “turned on” whether the litigant “truly consent[ed]” to the adjudication. Id. at 1946 (internal quotation marks omitted). Bahlul plainly did not “consent” to his trial by military commission. As the en banc court observed, he “objected to the commission’s authority *21 to try him” and “flatly refused to participate in the military commission proceedings,” even assuming his objections were “too general” to raise specific legal claims. Bahlul, 767 F.3d at 10 (internal quotation marks omitted); see Trial Tr. 96-97 (“Bah-lul has made it very clear tha!t he is boycotting and that he does not recognize this commission.”); contra Dis. Op. 66. Second, the Court in Sharif relied on the fact that bankruptcy judges are appointed, referred cases, allowed to keep cases, supervised, and removable by Article III judges, who thus retain “total control and jurisdiction” over bankruptcy adjudication. Sharif, 135 S.Ct. at 1944^5 (internal quotation marks omitted); see id. at 1939-40. The Court expressly conditioned its holding on this level of “control by the Article III courts.” Id. at 1944, 1946 Nothing of the sort is true in Bahlul’s case. Military commissions under the 2006 MCA are independent of the Article III courts except for very limited appellate review.
Another factor the Supreme Court has considered is the “concern[] that drove Congress to depart from the requirements of Article III.” Schor, 478 U.S. at 851, 106 S.Ct. 3245. In non-Article III adjudications upheld by the Supreme Court, Congress’s “concern” was the fact that an ostensibly “private” claim was so “closely intertwined with a federal regulatory program,” Granfinanciera, S.A v. Nordberg, 492 U.S. 33, 54, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), that the program would be “confounded” without the ability to adjudicate that claim. Schor, 478 U.S. at 856, 106 S.Ct. 3245; see Sharif, 135 S.Ct. at 1944-45; Stern, 131 S.Ct. at 2613-14; Thomas v. Union Carbide Agric. Products Co., 473 U.S. 568, 593-94, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985). Neither the government nor the dissent offer any reason to conclude that otherwise-valid military commission prosecutions will be “confounded” by the inability to prosecute non-law of war offenses.
Bahlul’s military commission fails a number of other Schor factors the dissent neglects to mention. The military commission resolves “all matters of fact and law in whatever domains of the law to which” a charge may lead. Stern, 131 S.Ct. at 2610 (internal quotation marks and alterations omitted). It “ ‘issue[s] final judgments, which are binding and enforceable,’ ” id. at 2610-11 (quoting Northern Pipeline, 458 U.S. at 85-86, 102 S.Ct. 2858 (plurality op.)); see Schor, 478 U.S. at 853, 106 S.Ct. 3245, and “subject to review .only if a party chooses to appeal,” Stem, 131 S.Ct. at 2619. As for the “origins and importance of the right to be adjudicated,” Schor, 478 U.S. at 851, 106 S.Ct. 3245, the right to “[f]reedom from imprisonment” is one of the oldest and most basic in our legal system. Zadvydas v. Davis, 533 U.S. 678, 690, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). The circumstances of Bahlul’s prosecution thus could not be further from Schor. There, Congress added to an Article I tribunal otherwise' within an established Article III exception the authority to adjudicate a closely intertwined common-law cause of action, only with the consent of the parties, without authority to issue final enforceable judgments, and with meaningful factual review on appeal. Here, in Bahlul’s case, Congress has created a standalone Article I tribunal to adjudicate his entire criminal case without his consent, with the ability to issue final enforceable judgments, and with almost no factual review on appeal.
If Bahlul’s military commission falls outside the historical Article III exception for law of war military commissions, then there is no question that it usurps “the essential attributes of judicial power.” Schor, 478 U.S. at 851, 106 S.Ct. 3245 (internal quotation marks omitted). The *22 Supreme Court unanimously agreed in Stem that - “Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in [an adjudication of private rights], without consent of the litigants, and subject only to ordinary appellate review.” 131 S.Ct. at 2624 (Breyer, J., dissenting); id. at 2615 (majority op.); see Thomas, 473 U.S. at 584, 105 S.Ct. 3325. The dissent struggles, unpersuasively, to avoid this conclusion. It suggests that military commissions somehow do not raise the same separation-of-powers concerns as bankruptcy courts, see Dis. Op. 68-69; contra Hamdan, 548 U.S. at 638, 126 S.Ct. 2749 (Kennedy, J., concurring in part), even though bankruptcy judges are appointed, supervised, and removable by Article III courts, see Sharif, 135 S.Ct. at 1944-45; Peretz v. United States, 501 U.S. 923, 938-39, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991). It points to the established Article III exception for military commissions, see Dis. Op. 68-69, even though the analysis in Schor is premised on the adjudication being outside of such an exception, as the dissent elsewhere acknowledges, see id. at 64, 65-66, 69. The government, unsurprisingly, has barely presented any balancing analysis, see Appellee’s Br. 51.
III.
For more than seventy years the Supreme Court has adhered to the definition of the law of war articulated in Quirin, which the government concedes does not prohibit' conspiracy. The government has failed to identify a sufficiently settled historical practice for this court to conclude that the inchoate conspiracy offense of which Bahlul was convicted falls within the Article III exception for law of war military commissions. Absent further guidance from the Supreme Court, this court must apply the settled limitations that Article III places on the other branches with respect to the “judicial Power of the United States.” U.S. Const, art. Ill, § 1.
Contrary to the government’s suggestion, vacating Bahlul’s inchoate conspiracy conviction does not “cast doubt on the constitutional validity of the most prominent military commission precedents in our nation’s history.” Appellee’s Br. 52. The Lincoln assassins and Colonel Grenfel were tried by mixed commissions, whose jurisdiction was based on martial law. The lawfulness of military commission jurisdiction over the charges against the Nazi saboteurs and Colepaugh was judicially upheld without having to reach the conspiracy charges. Neither does our holding “inappropriately restrict Congress’s ability, in the absence of broad concurrence by the international community, to adapt the range of offenses triable by military commission in light of future changes in the practice of modern warfare and the norms that govern it.” Id. at 38. Military commissions retain the ability to prosecute joint criminal enterprise, aiding and abetting, or any other offenses against the law of war, however it may evolve. Congress retains the authority it has always had to proscribe domestic offenses through the criminal law in the civil courts. The international law of war limits Congress’s authority because the Constitution expressly ties that authority to “the Law of Nations,” U.S. Const, art. I, § 8, cl. 10.
Accordingly, we hold that Bahlul’s conviction for inchoate conspiracy by a law of war military commission violated the separation of powers enshrined in Article III § 1 and must be vacated. We need not and do not address Bahlul’s other contentions.

. See, e.g., Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 609; Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 3; Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287; Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85; Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31; Convention Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277, 1 Bevans 631; Convention with Respect to the Laws and Customs of War on Land, July 29, 1899, 32 Stat. 1803, 1 Bevans 247.

. See Statute of the Special Court for Sierra Leone, Jan. 16, 2002, 2178 U.N.T.S. 138; Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90; Stat- ' ute of the International Tribunal for Rwanda, adopted by S.C. Res. 955, U.N. Doc. S/RES/ 955 (1994), reprinted in 33 I.L.M. 1598, 1602; Statute of the International Tribunal for the Former Yugoslavia, adopted by S.C. Res. 827, U.N. Doc. S/RES/827 (1993), reprinted in 32 I.L.M. 1159, 1192. Some modern tribunals recognize war crimes liability through participation in a joint criminal enterprise, see Prosecutor v. Milutinovic, Case No. IT-99-37-AR72, Decision on Dragoljub Ojdanic’s Motion Challenging Jurisdiction — Joint Criminal Enterprise, ¶ 26 (Int’l Crim. Trib. for the Former Yugoslavia, Appeals Chamber, May 21, 2003); Rwamakuba v. Prosecutor, Case No. ICTR-98-44-AR72.4, Decision on Interlocutory Appeal Regarding Application of Joint Criminal Enterprise to the Crime of Genocide, ¶ 30 (Oct. 22, 2004), but the prosecutor at Bahlul's military commission withdrew that charge against him, see Trial Tr. 110, 881 (cited in Bahlul, 767 F.3d at 39, 40-41 (Rogers, J., concurring in the judgment in part and dissenting)).